**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

**CASE NO. 16-23901-CIV-MARTINEZ/GOODMAN**

KRISTIAN ZAMBER,

      Plaintiff,

v.

AMERICAN AIRLINES, INC.,

      Defendant.

_____/

**REPORT AND RECOMMENDATIONS ON**
**PLAINTIFF'S MOTION TO ENFORCE SETTLEMENT AGREEMENT**

"It ain't over till the fat lady sings" is a colloquialism which means that one cannot know the outcome of an ongoing situation even though the situation is -- or appears to be -- nearing what seems to be a conclusion. Defendant American Airlines, Inc.'s opposition to Plaintiff Kristian Zamber's motion to enforce a purported $25 million oral settlement agreement in this putative class action lawsuit implicitly urges the fat-lady idiom.

American contends that it and Zamber never entered into an enforceable settlement agreement even though it agreed to the joint filing of a "Notice of Settlement and Joint Motion to Stay Deadlines." [ECF No. 211]. That submission, which American reviewed and approved before it was filed, caused the Court, on the very next business

day, to enter an "Order on Notice of Settlement and Denying All Pending Motions as Moot." [ECF No. 212]. The order described the notice as "indicating that the parties have reached a settlement in this matter" and directed the Clerk to deny all pending motions as moot and to administratively close the case (for statistical purposes only). *Id.*

Continuing with the same idiom, American's position can be described as contending that not only did the fat lady not finish singing, but she never even approached a legal finale on the litigation stage because the oral agreement covered only a *few* terms but did not encompass *all* the essential terms.

To provide only a few of the arguments asserted, American notes that (1) Zamber's motion seeks to enforce a purported settlement agreement against only American even though all settlement discussions also involved AGA Service Company (a/k/a Allianz), an insurance company not named as a defendant but which was going to be the sole funder of any settlement; (2) the so-called agreement did not resolve the issue of whether Allianz would even be a participant or signatory to the settlement agreement; (3) there was no concensus on the specific injunctive relief that American and Allianz would agree to; (4) there was no agreement about the amount of attorney's fees Zamber's counsel would receive (an issue that generated a potential $5 million swing); (5) Zamber announced an intent to proceed with discovery when the parties could not resolve their differences (a move that American says is fundamentally inconsistent with a settlement); (6) Zamber's counsel circulated an email more than a

month after the alleged oral settlement agreement was entered into, opining that "we are **nearly** there on material terms" [ECF No. 237-3, p. 375 (emphasis added)]; and (7) the mediator (a former federal district judge and former United States Attorney in this district) announced, in an email, an **impasse** after the parties could not agree on the amount of attorney's fees for Zamber's counsel.

On the other hand, Zamber argues that the metaphorical fat lady *has* finished singing the main song about the settlement agreement, and he flags the following: (1) American's opposition does not dispute that the two litigation parties agreed on what he views as the material, essential terms for a resolution of this alleged class action; (2) the other issues that American says were not resolved are merely collateral, non-essential terms; (3) American's counsel later advised that he expected the final execution of the settlement documents to occur by the end of that week; (4) the amount of attorney's fees is not an essential term of the settlement because the Court, not the parties, decides that amount; and (5) Allianz and American can object to the attorney's fees requested by Zamber's counsel if they believe the fee request is unreasonable.

Following a three-and-a-half-hour hearing on the motion and one more unsuccessful mediation effort (on April 23, 2019),[1] and for the reasons outlined below, the Undersigned **respectfully recommends** that United States District Judge Jose E.

---

[1] The mediator filed a report advising that an impasse had been reached. [ECF No. 277]. It appears as though this latest mediation, which occurred months after the hearing on the motion to enforce the alleged settlement agreement, lasted no more than a few hours.

Martinez **deny** the motion to enforce, re-open the case, and issue a new trial scheduling order. To revisit the idiom used in this introduction, the Undersigned finds that the fat lady (1) had indeed started singing about the financial terms of the settlement song; (2) had not quite completed the last few choruses containing lyrics about injunctive relief, the amount of attorney's fees, and who would be a party to the settlement agreement; and (3) stopped singing once the microphone was turned off by the mediator-issued impasse notice and the filing of a motion to enforce the professed settlement agreement.

## I.      Background

Zamber's two-count complaint asserts only state claims against American: (1) for violating Florida's Deceptive and Unfair Trade Practices Act ("FDUTPA") and (2) for unjust enrichment. [ECF No. 1]

Zamber's lawsuit concerns customers who purchased travel insurance from Allianz after they bought airline tickets from American. American allegedly received a kickback or commission from the insurance carrier and mislead consumers by misrepresenting to them that "[t]his insurance is offered by a third party, Allianz Global Assistance, <u>not American Airlines</u>. Plans underwritten by Jefferson Insurance Company or BCS Insurance Company. Recommended by AGA Service Company, the licensed producer and administrator of this plan." [ECF No. 1, p. 3, ¶ 8 (emphasis in original)].

Zamber claims that this information "falsely portrays the travel insurance product as a 'pass through' charge, one wherein American has no financial interest."

[ECF No. 27, p. 3]. Zamber also contends that this "misrepresentation gives the consumer the belief that all his funds for a travel insurance product are retained by the third-party insurer, not improperly kicked back to American as profit." *Id.*

The parties actively litigated the case. Ten depositions were taken (including the Rule 30(b)(6) depositions of American and Allianz), and Zamber moved for partial summary judgment. [ECF Nos. 181; 183]. American responded, and Zamber filed a reply. [ECF Nos. 198–201; 207–08]. Zamber's motion sought summary judgment on his unjust enrichment claim and many of American's affirmative defenses. The most-important affirmative defense targeted in the motion was American's assertion of the Airline Deregulation Act, which American says preempts the claims here. American raised the ADA preemption defense in its motion to dismiss. [ECF No. 13].

After three in-person mediations before former U.S. District Judge and former United States Attorney Thomas Scott, and after many discussions that took place since December 2017, Zamber, American, and Allianz reached an agreement "in principle" with Zamber on September 14, 2018 on the following financial terms for a national class settlement: funding by Allianz of claims of $11 per policy, up to a limit of $25 million, with attorney's fees to be paid by Allianz and deducted from the $25 million.

The agreement-in-principle was oral and was entered into late on the evening of September 14, 2018 -- the day of Zamber's extended deadline to file a motion for class certification. [ECF No. 205]. Zamber wanted to file a notice advising the Court that the

case had settled, but American, after discussing the suggestion with Allianz, balked. Ultimately, the parties tweaked and massaged the language to a brief three sentences, including a one-sentence request to stay discovery and all deadlines.

By filing the joint notice, Zamber avoided the need to file a class certification motion. [ECF No. 211].

The notice/motion to stay, which Zamber's counsel filed at 10:15 p.m. on a Friday, is entitled, "Notice of Settlement and Joint Motion to Stay Deadlines." [ECF No. 211]. The notice/motion to stay reads as follows:

> The parties have reached an agreement **in principle** on the **financial terms** of a class settlement. They are **negotiating remaining terms** of the settlement and **expect to finalize** them **shortly**. As a result, the parties move this Court to stay discovery and all deadlines pending submission of a motion for preliminary approval of their settlement within thirty (30) days.

[ECF No. 211 (emphasis added)].

Early in the afternoon of the next business day, Monday, September 17, 2018, Judge Martinez entered an Order on Notice of Settlement and Denying All Pending Motions as Moot. [ECF No. 212]. The order described the notice as "indicating that the parties **have** reached a settlement **in this matter**" [ECF No. 212 (emphasis added)] -- in contrast to an agreement solely "in principle" and only on "the financial terms" of a class settlement, with the remaining terms under ongoing negotiation [ECF No. 211].

The order denied all pending motions as moot and required the filing of a notice of dismissal or stipulation of dismissal and other documents "necessary to conclude this

action" by October 17, 2018. [ECF No. 212].

But the parties were in no position to file a stipulation of dismissal by that deadline. The ongoing negotiations were not unfolding smoothly, so Zamber's counsel filed, at six minutes before the midnight deadline, an Unopposed Motion for Extension of Settlement Submission Deadline. [ECF No. 215]. The motion had not been first sent to counsel for American (or Allianz), an omission that generated a private, strongly-worded rebuke from American's counsel. The motion represented that "[t]he Parties now have an agreement in principle on the financial and non-financial components of the class settlement, and they are working in conjunction with the Honorable Thomas Scott to finalize and submit the settlement to this Court." *Id.* The motion asked for an enlargement of time, to October 31, 2018, to submit the required paperwork. *Id.*

Not familiar with the actual status of the negotiations and undoubtedly not aware of the disputes that had been generated, Judge Martinez granted the requested enlargement the following day. [ECF No. 216].

On October 30, 2018, Zamber filed a Notice of Intent to File Motion to Enforce Parties' Settlement. [ECF No. 217]. In that notice, Zamber explained that the September 14, 2018 notice advised the Court that the parties "had reached a financial settlement of this matter" (as opposed to an agreement "in principle" [ECF No. 211]). [ECF No. 217]. It gave notice that Zamber would file a motion to enforce the terms of the parties' settlement before the October 31st deadline. [ECF No. 217].

Approximately two hours after Zamber filed this notice, American filed a Motion for Entry of Revised Scheduling Order, asking the Court to restore the case to its active docket and enter a revised pretrial scheduling order. [ECF No. 218]. American advised that, "[u]nfortunately, the parties have been unable to agree on all terms of the settlement agreement, including **several economic terms**." [ECF No. 218, p. 1 (emphasis added)]. It also said that the mediator declared an impasse on October 26, 2018. *Id.*

Zamber followed through on his notice and filed a motion to enforce the settlement agreement on October 31, 2018. [ECF No. 223].[2] Zamber argued that "Eleventh Circuit precedent does not allow American to change its mind at the eleventh hour, after it has already stipulated to this Court that a settlement has been reached." [ECF No. 238-1, p. 4]. The motion contends that (1) the parties agreed to all material terms of the settlement; (2) American's counsel had full authority to agree to the settlement; (3) American had previously stipulated to the Court that "an agreement existed on the financial terms of the settlement"; and (4) American and Allianz embarked on an eleventh-hour campaign to minimize their financial exposure by having American inform Zamber's counsel on the October 17, 2018 deadline for submission of the settlement documents that American would "retract the settlement" if Zamber's counsel would not agree to limit their attorney's fees to 10% of the $25 million

---

[2]      This submission was filed under seal along with a redacted, publicly-filed version. [ECF No. 222]. Zamber later publicly filed an unredacted version of the motion to enforce. [ECF No. 238-1]. Citations to the motion to enforce will be to the public, unredacted version of the motion to enforce.

common fund. [*See generally* ECF No. 238-1].

The parties have submitted extensive briefing on the motion to enforce, including the filing of several attorney declarations from counsel representing Zamber, American, and Allianz. [ECF Nos. 237; 243; 254; 265–66; 273–74].

## II.     Additional Facts Highlighted by Zamber

In his motion, Zamber contends that the oral settlement agreement reached on September 14th also included a provision that "American would agree to nationwide injunctive relief in the form of a disclosure to consumers using its website of its financial interest in the travel insurance sold on its website." [ECF No. 238-1, p. 5]. (The Undersigned notes that injunctive relief is not a "financial term," which is what the parties advised the Court on September 14th when they discussed the settlement "in principle.") The motion also contends that the oral agreement "in principle" also included a provision where the parties would provide each other with mutual, global releases. *Id.* And, the motion continues, the oral agreement also included, as of September 14th, a term for the payment of fees and costs from the common fund. *Id.*

As alleged in Zamber's motion, the only issues remaining after the September 14th oral settlement agreement were "ancillary terms of the global settlement incidental to the material terms." *Id.* So Zamber's counsel met with American's in-house counsel (Don Broadfield) and outside counsel, on September 27, 2018, to review and discuss these ancillary terms. *Id.* American's counsel conveyed that, based on the indemnity

relationship between American and Allianz related to travel insurance products sold on American's website, Allianz would be providing the funds for the $25 million common fund. *Id.* American's counsel then indicated that Allianz needed multiple weeks to compile the list of settlement class members, but all counsel agreed that this did not need to delay execution of the settlement agreement. *Id.*

Continuing with the chronology outlined in Zamber's motion, on October 12, 2018, American's counsel provided Zamber's counsel with drafts of all relevant settlement documents, including the settlement agreement itself, proposed preliminary approval orders for submission to the Court, and draft class notices. *Id.* at 5–6. On October 13, 2018, Zamber's counsel sent "limited comments to American's counsel regarding certain non-material terms of the settlement agreement." *Id.* at 6.

As outlined in Zamber's motion, his counsel had a telephone conference call with American's counsel (i.e., three attorneys) on October 15, 2018, and the parties agreed during the call that the mutual releases would also include Allianz, American's indemnitor, **and that Allianz would be a signatory to the settlement agreement**. *Id.* Counsel then discussed the remaining ancillary settlement items that had been identified in Zamber's counsel's comments to American's settlement agreement draft. *Id.* In Zamber's view of the history, American's counsel expressed no belief that any of Zamber's counsel's "limited comments on ancillary terms" would create an issue for American. *Id.*

During this October 15th call, American's counsel asked to discuss the issue of Zamber's counsel's attorney's fees. *Id.* In American's October 12th draft agreement, American had included a demand that Zamber's counsel could not seek more than 10% of the common fund as an attorney's fees award. *Id.* But Zamber notes that his counsel's October 13th comments indicated that the amount of fees is not a material term of the agreement because it is solely within the Court's power to determine a reasonable attorney's fee. *Id.* Zamber's counsel informed American's counsel that they could not discuss the fee issue until after the material terms of the agreement were resolved. *Id.*

On October 17, 2018, the deadline for submitting the settlement agreement, Zamber's counsel emailed one of American's attorneys in New York, James Brandt, noting the apparent agreement on material terms and asking -- given the impending deadline -- whether he wished to, at that time, discuss American's issue with fees. *Id.* Brandt then called Zamber's counsel and, according to Zamber, advised him that although the parties might need to ask the Court to extend the settlement submission deadline briefly, "he saw no impediment to having the settlement agreement executed '**by the end of the week**.'" *Id.* at 6–7 (emphasis added).

That did not happen.

Instead, as alleged in Zamber's motion, Brandt later informed Zamber's attorneys "that if Plaintiff's counsel did not agree to American's demand of a fee no greater than 10% of the common fund, American would retract the settlement in full

11

and provide no relief to the settlement class." *Id.* at 7.

The next significant development, according to Zamber, is his counsel's filing of a motion for a two-week extension of the settlement submission deadline. *Id.* Zamber contends that "***American failed to identify a single material term of the settlement that remained in dispute[] between the parties***" during that interval. *Id.* (emphasis in original). Zamber says that this omission is significant because his counsel twice asked for American or Allianz to identify any remaining open issues -- but both failed to respond. *Id.*

Zamber repeatedly and stridently contends that the attorney's fees issue "is not, and never was, a material term of the parties' settlement. [ECF No. 243, p. 7]. According to Zamber's reply and a supporting declaration (from attorney Scott Cosgrove), Cosgrove had at least three separate conversations with counsel for American and Allianz before the September 14th purported settlement agreement "in which Plaintiff's counsel categorically stated that no class settlement could be conditioned upon counsel's agreement to an attorney's fees demand." *Id.* at 7–8.

To provide further detail on the attorney's fees issue, Zamber also alleged that Allianz attorney Lazaro Fernandez informed Cosgrove that Allianz wanted to retain the right to ***object*** to any fee request Zamber's counsel submitted. *Id.* at 8. According to Zamber, Cosgrove informed Fernandez that this was acceptable. *Id.* Cosgrove, seeking to make Zamber's position clear on this point, then contacted Brandt, American's New

York counsel, to ensure American also understood Zamber's refusal to negotiate fees as part of the settlement. *Id.* When Cosgrove told Brandt that Zamber's counsel would not include an agreement on fees as part of a class-wide settlement, Brandt responded with a single word, "***agreed***." *Id.* (emphasis in original).

Finally, after speaking to Brandt and receiving his consent that a fee agreement was not part of a settlement, Cosgrove called Humberto Ocariz, American's local counsel, to discuss the same issue. *Id.* Ocariz, just as Brandt had done, confirmed his agreement that a class-wide resolution of the case was not dependent upon a fee agreement. *Id.*

Zamber also contends in his reply that Allianz is within this Court's jurisdiction because it supposedly "fully consented to this Court's jurisdiction, both expressly and through its litigation conduct." *Id.* at 3. Zamber notes that Allianz consented to jurisdiction for all matters concerning the Amended Stipulated Protective Order and a Rule 45 subpoena. In addition, Zamber highlights the following facts: (1) Allianz's counsel has appeared at every hearing held in this Court and made argument on Allianz's behalf on more than half a dozen occasions; (2) Allianz's counsel attended every deposition taken in this case except one; and (3) Allianz fully participated in -- and attended -- the Court-ordered mediations. *Id.*

## III.   Additional Facts Highlighted by American

American argues that many material terms remained open, so there was no

enforceable settlement agreement reached on September 14, 2018. The most critical open term, according to American, was whether Allianz would be a party to the settlement agreement. American points to Zamber's agreement, on October 15, 2018, to Allianz being a party to the settlement agreement as undermining his motion to enforce the settlement agreement -- because the motion is based on an oral agreement supposedly entered a month earlier.

American also contends that it agreed in principle to only "*one*" financial term as of September 14th: a $25 million aggregate cap on settlement payments and attorney's fees, based on a maximum $11 per policy payment for qualifying claimants. [ECF No. 237, p. 10]. In its response, American lists several "remaining" terms, all of which it says are material and that still had to be negotiated. *Id.* Those terms are: (1) whether the class would include corporate purchasers and indirect purchasers (like those who bought through travel agents) -- a distinction that could greatly affect the size of the class of claimants; (2) whether the administrative expenses that Allianz would bear (estimated at well over a million dollars) would be within the $25 million cap; (3) the specific injunctive relief that American and Allianz would consent to; (4) the mechanism for Allianz's participation, given that it is not a party to this lawsuit (and, apparently, from Zamber's perspective, whether Allianz would be a party to the settlement agreement); (5) the contours of the releases that American and Allianz would get; and (6) the size of the attorney's fee for Zamber's counsel. *Id.* at 6.

Moreover, American's list of remaining material terms expanded when it pinpointed the supposedly material terms that still remained open after the mediator declared an impasse on October 25, 2018: (1) the content and format of the injunctive relief, including the language to be added to or revised on American's website; (2) whether claimants would be limited to a maximum number of policies for which they could file a claim (a practical method for excluding corporate travel departments and indirect purchasers from the class) and what information claimants would be required to provide to make a valid claim; (3) the scope of the releases for American and Allianz and its underwriters; (4) the amount of the attorneys' fees and costs; (5) whether the settlement fund would be a common fund or not; (6) whether the settlement fund would be held in trust by Allianz or by the settlement administrator; (7) whether the attorneys' fees would be determined as a percentage of the fund or as a flat amount by agreement; (8) whether the expenses for the settlement administrator and notice program would come out the settlement fund or be paid by Allianz outside of the $25 million cap (based on estimates, these fees could approximate $1.5 million); (9) whether certain grounds would permit the parties to terminate the settlement after executing an agreement, including any court-determined increase in the agreed-to attorneys' fees, or a refusal by Allianz to fund the settlement; (10) whether there would be a blow provision,[3] and, if so, the number of opt-outs that would permit American or Allianz to

---

[3]      A "blow" provision in a class action settlement allows a party to terminate the

terminate the settlement; (11) the timeline for Zamber to file a motion for preliminary approval; (12) the schedule for the claims process, including to file a claim, opt out, or object; and (13) the notice plan. *Id.* at 8.

American brands as "preposterous" the argument that only ancillary terms incidental to the material terms remained after the parties filed their joint notice on September 14, 2018. *Id.* at 7. Although American approved the language indicating that an agreement in principle on "the" financial terms had been reached, it emphasizes that the notice also asked for thirty days to work on "negotiating remaining terms of the settlement." *Id.*

Moreover, American highlights the fact that Zamber's counsel wrote, on October 17, 2018, more than a month after the alleged enforceable oral settlement agreement was reached on all material terms, that "I feel like we are **nearly there** on material terms[.]" [ECF Nos. 237, p. 13; 237-3, p. 375 (emphasis added)].

American also focuses on the proposed injunctive relief, which could have required changes to language on its website, which it describes as "one of the most widely visited websites in the world." [ECF No. 237, p. 20]. American represents that

---

settlement under certain circumstances. Typically, a blow provision allows the defendant to terminate the settlement if a certain portion of the settlement class excludes themselves from the settlement class. *See generally* Niki Mendoza, *How to Structure Securities Class Action Settlement to Obtain Court Approval and Global Peace*, American Bar, https://www.americanbar.org/groups/litigation/committees/securities /articles/2018/summer2018-how-to-structure-securities-class-action-settlements-to-obtain-court-approval-and-global-peace/ (last visited April 29, 2019).

making any changes to its website would have required approval from senior executives in both the legal department and affected business unit. *Id.* Moreover, American notes, it had not even proposed any language to either Zamber or Allianz by the time the additional discussions broke down.

As part of its opposition response, American submitted a declaration from Brandt, American's New York-based attorney. [ECF No. 237-3]. In it, Brandt discusses an October 15, 2018 telephone call he had with Alec Schultz, one of Zamber's attorneys. Brandt says that, in that telephone call, he emphasized "that there would be no deal until the attorneys' fee issue was resolved." [ECF No. 237-3, pp. 8–9]. According to Brandt, Schultz acknowledged his understanding and asked that the fee issue be negotiated last. Thus, according to Brandt, "[w]hile American and Allianz agreed [to] put off negotiations on this term until the end, it remained a critical term of any settlement agreement." [ECF No. 237-3, p. 9].

Two days later, on the morning of October 17, 2018, Schultz sent Brandt an email inviting a conversation about attorney's fees. Schultz wrote, "If you'd like to chat briefly on fees/costs today please feel free to give me a call." *Id.*

As outlined by Brandt, he followed up and spoke on the telephone with Schultz, who advised that Eleventh Circuit law allowed for attorney's fees in the range of 25-30% of the class settlement common fund and that his firm intended to seek fees in that range. *Id.* Brandt told Schultz that "neither American nor Allianz would agree to

anything remotely in that range, and there would never be a settlement unless he could get close to the $2.5 million attorneys' fee number that American and Allianz had proposed." *Id.* Schultz then said that he would speak with this partner, Cosgrove, about it. *Id.* Nevertheless, Schultz "certainly did not suggest that the issue of attorney's fees was not a material term of any deal or that there could be a settlement absent an agreement on fees." *Id.*

Moreover, the Brandt declaration continues, "at no time did Mr. Schultz suggest that the parties had an enforceable settlement agreement." *Id.*

Later on October 17th, Brandt received an email from Cosgrove, who advised that his firm would not even entertain any discussion about its fee request until after the settlement with the class is concluded. Cosgrove's email said that he had repeatedly received assurances that a settlement would in no way be tied to a potential fee request. He ended the email by saying, "It is beyond unethical, and we will not participate in it." *Id.* at 377.

But Brandt said this email was a "surprise" because Cosgrove's partner, Schultz, had *already* "reached out" to "discuss fees" and mentioned a likely request in the 25-30% range. *Id.* at 10. In addition, Brandt said he was surprised because it contradicted his understanding that attorney's fees were a material part of the settlement. Therefore, Brandt concludes, negotiations came to an end -- even though the parties later communicated with the mediator to work through the dispute.

American also points to an October 18, 2018 email from Schultz, explaining that "We sent you comments on Saturday indicating that we cannot discuss fee numbers with you **until the material terms are agreed to**." *Id.* at 12 (emphasis added).

The parties continued to communicate with the mediator, and Cosgrove emailed the mediator on October 22, 2018, without sending copies to counsel for American or Allianz. In that email, Cosgrove said, "Here is where I come out: 1. We **reach a final deal on the terms of the settlement**; 2. **After** the settlement is final, we can discuss fees/costs. If we can agree, great. If not, they are free to object to any fee/cost request. But agreement on fee is not a condition to resolution." *Id.* at 14 (emphasis added).

Brandt's declaration provides further details about the communications following Cosgrove's October 22nd email to the mediator. In particular, the next significant development occurred on October 24, 2018, when Schultz ("unexpectedly," according to Brandt) circulated a draft Motion for a Revised Scheduling Order to reinstate the pretrial dates and a request to "[p]lease provide us with depo dates for your experts who have already submitted reports, and please advise whether you need us to subpoena them, or whether we can simply serve a notice on you and you'll produce them on mutually agreeable dates." *Id.* According to Brandt's declaration, this request indicated to him that "the negotiations were off and that the case would proceed." *Id.*

On October 26, 2018, Schultz emailed Brandt, once again asking for deposition

dates for American's experts, noting that he would "like the professor first." *Id.* at 15. As portrayed by Brandt, "at no time did Mr. Schultz (or Mr. Cosgrove) indicate that they believed that counsel had finalized negotiating the terms of the settlement or that a final, authorized agreement was in place. Rather, the clear message was that no settlement had been reached and discovery would move forward." *Id.*

Zamber filed his notice indicating his intent to file a motion to enforce the settlement agreement a few days later, on October 30, 2018, with the actual motion being filed on October 31, 2018. [ECF Nos. 217; 222].

American also filed the declarations of Ocariz, its local counsel (from the Shook Hardy and Bacon LLP firm) and Donald Broadfield (senior attorney and a managing director at American) to support its opposition. [ECF Nos. 237-5; 237-6].

Among other points, Broadfield explained that the American business team responsible for the trip insurance relationship with Allianz would need to approve any settlement because "part of the agreement would have had an impact on how trip insurance was presented and advertised on AA.com." [ECF No. 237-5, p. 3]. Pointing out that "[a]t no time would American enter into any oral agreement," Broadfield also explained that "American would never agree to some loose concept concerning changes to the AA.com website." *Id.* at 3–4.

Ocariz's 15-page declaration is more detailed, and the Undersigned will not rehash all of the points asserted there. However, for purposes of this report and

recommendations, the Undersigned will note some of the more relevant points: (1) American never signed or initialed or otherwise approved of a term sheet that Zamber's counsel circulated on September 14, 2018; (2) American declined to sign a term sheet for several reasons, including that numerous material terms were omitted, the release language needed to be negotiated, and injunctive relief needed to be specified; (3) neither Schultz nor Cosgrove ever took the position that an enforceable settlement agreement had been finalized before they filed the motion to enforce the settlement agreement; (4) American always took the position that it would not settle without Allianz because Allianz would provide the settlement funding; (5) at times, Allianz's counsel negotiated directly with Zamber's counsel, outside the presence of American or its lawyers; (6) the $25 million offer was a proposal made by *Allianz's* counsel directly to Zamber's counsel, and American's counsel "did not participate in that discussion"; (7) the parties discussed the notion of adding Allianz as a party to the settlement agreement, but Zamber's counsel was hesitant to do so "because of concern of taking on responsibility to ensure that Allianz funded the settlement"; (8) Ocariz was present at a mediation session when Allianz counsel Fernandez advised both Cosgrove and Schultz that Allianz would not agree to fees greater than $2.5 million; and (9) Cosgrove responded by saying that while he would not negotiate fees until the remaining material terms were resolved, he "understood" the position and "did not expect any problems." [*See generally* ECF No. 237-6].

#### IV. Additional Facts Highlighted by Allianz (Through its Counsel's Declaration)

Allianz did not submit a written response to the motion to enforce, as it is not a named party in the lawsuit and the motion to enforce does not target it. Allianz did not accept the Undersigned's offer to participate at the hearing, and it did not submit any under-seal questions to ask Zamber's counsel at the hearing. Nevertheless, the Undersigned is familiar with Allianz's factual position because American submitted Fernandez's declaration as an exhibit to its opposition response. [ECF No. 237-4].

As before, the Undersigned will not repeat all the points made in Fernandez's declaration. In addition, the Undersigned will not highlight sections that have already been comprehensively addressed.

Among other points, Fernandez's nine-and-a-half-page declaration asserts the following points: (1) Allianz authorized him to participate in mediation negotiations but never gave him authority to bind Allianz to any settlement terms; (2) all parties, including Zamber's counsel, were aware of this reality as he routinely advised them of Allianz's response to issues as they arose; (3) Allianz never approved of, or agreed to, a settlement because, among other reasons, numerous material terms were unresolved; (4) during one of the formal mediation sessions, he advised Zamber's counsel that the amount of attorney's fees was a material term to any possible settlement and that Allianz would never agree to a settlement without a prior agreement on fees; (5) Zamber's counsel advised that they would not negotiate fees because they believed they

were precluded from doing so; (6) Fernandez advised everyone that despite this no-negotiation position, Allianz would not agree to a settlement without an agreement on fees; (7) Fernandez advised that Allianz would never agree to fees in excess of $2.5 million; (8) during a telephone conversation with Cosgrove following the third in-person mediation, Fernandez told Cosgrove "that Allianz would never allow itself to be in the position of entering into an agreement that resulted in Allianz and American needing to object to Plaintiff's fee request in excess of $2.5 million"; and (9) Fernandez received copies of draft settlement agreements circulated by the parties, but Schultz's October 13th redlined draft "sought to change the proposed agreement so as to prevent American and Allianz from withdrawing from or terminating a settlement if the Court increased the agreed upon amount of attorney's fees." [*See generally* ECF No. 237-4].

## V.     Additional Facts Highlighted by Zamber (Through his Counsel's Declaration)

After American filed its opposition response to Zamber's motion to enforce, Zamber filed a reply and attached Cosgrove's declaration. [ECF No. 243-1]. His declaration makes the following points, among others: (1) he always made clear during the negotiations that he would not discuss his firm's fee request until the settlement negotiations were concluded because he believed it was impermissible; (2) during a June 7, 2018 restaurant meeting with Fernandez to discuss the case, Fernandez told him that Allianz wanted the right to object to the fee request if they could not agree on an

amount his firm would seek;[4] (3) he advised Brandt about his lunch conversation, and Brandt never suggested that attorney's fees would be a condition to settlement; (4) he and Fernandez had a telephone conversation in September 2018, in which Fernandez advised that Allianz would seek to limit the fees to $2.5 million, and Cosgrove advised that he would not condition a settlement on the fee request; (5) he immediately telephoned Brandt and advised that he would immediately stop all settlement talks if American and Allianz intended to make his firm's fee request a settlement condition; (6) Brandt confirmed that Cosgrove's firm's fee request would not be a condition of settlement; (7) Cosgrove also placed a telephone call to Ocariz right after speaking with Brandt, and Ocariz confirmed that American was not making the fee request a settlement condition; (8) Cosgrove learned from Schultz on October 17, 2018, that American and Allianz were not taking the position that their fee request was a settlement condition; (9) there is no email traffic before October 22, 2018, in which Cosgrove implicitly agreed that his firm would not seek a fee award of more than $2.5 million; and (10) at no time before October 18, 2018, did he agree that settlement would be conditioned on his firm's fee request. [*See generally* ECF No. 243-1].

---

[4]     This representation is fundamentally inconsistent with Fernandez's declaration, where he said that Allianz would never agree to such an arrangement. The Undersigned is unable to resolve that factual dispute based on this record, and I, therefore, will not try to do so. I am merely flagging the reality that the two declarations appear irreconcilably at odds on this point.

## VI.     The Hearing

Cosgrove and Schultz appeared for Zamber, Brandt and Ocariz appeared for American, Broadfield sat in the gallery as an observer, and Fernandez also sat in the gallery and said that he was attending only as an observer. The Court will not, for the most part, repeat the points outlined above. Instead, this section about the hearing will mention developments and arguments not discussed in detail above.

Given the debate over the absence of an agreement over the amount of attorney's fees, the Undersigned flagged this issue and noted that many class action settlement agreements contain provisions in which the defendants agree to not oppose an attorney's fees request up to a certain dollar amount. Called "clear-sailing clauses," these provisions are often used but sometimes criticized because they "could allow a defendant to pay class counsel excessive fees and costs in exchange for counsel accepting an unfair settlement on behalf of the class." *Poertner v. Gillette Co.*, 618 F. App'x 624, 630 n.6 (11th Cir. 2015) (internal quotations omitted). Cosgrove advised that a clear-sailing clause sometimes triggers an objection.

During the hearing, the parties confirmed that the draft settlement agreements circulated after September 14, 2018, contained a reverter clause, which means that portions of the $25 million common fund not used to pay claims, fees, and costs would revert to American, who would then presumably pass it on to Allianz, which would be funding the purported settlement. The reverter clause is also sometimes known as a

"kicker" clause, which provides that "all fees not awarded would revert to defendants rather than be added to the *cy pres* fund or otherwise benefit the class." *Id*.[5]

The Undersigned then confirmed that a difference in attorney's fees between a 30% award of $7.5 million and a 10% award cap of $2.5 million would be $5 million and that the difference would be returned to American/Allianz.

Brandt argued that Zamber's counsel was adopting inconsistent positions. On the one hand, Brandt noted, Zamber contends that an oral enforceable settlement agreement containing all material terms was reached on September 14. On the other hand, Cosgrove was stridently refusing (as late as October) to negotiate attorney's fees until an agreement had been reached. But if an agreement had been reached by September 14, Brandt argued, then Cosgrove should have felt comfortable discussing the amount of his firm's attorney's fees in October. Therefore, Brandt concluded, Cosgrove's stated refusal to discuss fees after September 14 is the proof that even *he* did not view a settlement as having been reached.

---

[5]      In *Poertner*, the Eleventh Circuit explained that "[s]ome courts and commentators have noted that kicker clauses are potentially problematic because they deprive the class of benefits that the defendant is willing to pay." *Id*. Although there has been some concern that clear-sailing and kicker clauses might be a subtle sign that the class is not getting as good a deal as it could have if class counsel were not overlooking potential unfairness in order to increase their fees and costs, the mere existence of these clauses in class action settlements does not mean that the agreement is unfair or should not be approved. In *Poertner*, for example, the Eleventh Circuit affirmed a final order approving the settlement and awarding class counsel fees and costs after noting that the appellant's self-dealing contention was "belied by the record" because "the parties settled only after engaging in extensive arms-length negotiations moderated by an experienced, court-appointed mediator." *Id.* at 630.

In response to a question from the Undersigned about the fact that the joint submission filed on September 14 is entitled, in part, "Notice of **Settlement**" [ECF No. 211 (emphasis added)], Ocariz explained that American and its counsel focused on the body of the document, not its heading.

The Undersigned pointed out that Judge Martinez's follow-up order mentioned a settlement and denied all pending motions (including a fully-briefed summary-judgment motion), but that American never tried to clarify that the parties had reached only a possible settlement or settlement in principle or the general contours of a potential settlement or an agreement on less than all the material terms. Brandt said that he did not anticipate any problems but conceded that "maybe" the attorneys "should have been more diligent" in highlighting what had been agreed to and what remained to be negotiated.

The Undersigned also mentioned that Schultz's late-October emails about resuming expert witness discovery appear inconsistent with the view that the case had settled. Schultz conceded that depositions are "inconsistent" with a this-case-has-been-settled position but said (1) he had not researched "enforcement law" at the time and (2) he was worried about class deadlines and other deadlines and was merely being prudent to cover his bases. In response, Brandt asked a rhetorical question: how could Schultz resume and schedule discovery if Judge Martinez had already dismissed the case?

27

Brandt also rejected, as "revisionist history," the notion that Schultz needed to conduct additional legal research about enforcement of settlement agreements before determining whether it would be appropriate to issue a discovery timetable and schedule.

Cosgrove took issue with the view that Judge Scott's impasse notice is evidence that Judge Scott viewed the attorney's fees as an essential term of the settlement. Instead, Cosgrove argued, Judge Scott said there was an impasse because American and Allianz simply **announced** that they would not sign a settlement agreement without an agreement on attorney's fees.

Given that the joint notice said the parties had agreed "in principle" to "**the financial terms**" [ECF No. 211 (emphasis added)] but there had been no agreement on attorney's fees as of the September 14, 2018 joint notice, Brandt insisted that attorney's fees were essential and material but were not encompassed by the notice because they were not part of "the *financial t*erms."

Brandt argued that injunctive relief and the specifics of the injunctive relief were, and still are, essential and material parts of any settlement agreement. He noted that the entire lawsuit is about what American and Allianz disclose about trip insurance, so, he asked, if injunctive relief is not material to Zamber, then he should not have sued American in the first place. Brandt said this in response to an under-seal question submitted to me by Zamber before the hearing: "If Plaintiff doesn't believe injunctive

relief is a material term to the settlement, [then] why would your uncertainty as to the parameters of injunctive relief preclude enforcement here?" [ECF No. 259].[6]

Responding to that point, Zamber's counsel explained that the *concept* of injunctive relief is material but that the specific *language* used is not. Brandt quickly disagreed, saying that the language would certainly be material to American. Brandt also noted that injunctive relief is mentioned in the term sheet that Zamber's counsel prepared (but that American never signed nor approved).

Zamber's counsel acknowledged that Allianz was not a formal, named party in the lawsuit but argued that Allianz did agree to fund the settlement.

On a related point, Brandt stressed that *American* was not the party who agreed to set up a $25 million fund -- it was Allianz.

Brandt noted that American crossed out the phrase "the Parties agreed to the material terms of a Settlement on September 14, 2018, and signed the Settlement Agreement on _____ 2018," in its October 12, 2018 marked-up draft. [ECF No. 237-3, p. 202].

Schultz was confronted with his email comment that he viewed the parties as "**nearly** there on material terms" [ECF No. 237-3, p. 375 (emphasis added)] and admitted that it is inconsistent with the position that the parties already entered into an

---

[6]     The Undersigned advised the parties that their under-seal questions would be read aloud at the hearing, regardless of whether I actually asked the question. Therefore, the questions submitted under seal by American and Zamber are now public and there is no longer a need to provide confidential treatment for them.

enforceable settlement agreement (which would have required consent on *all* material terms). Schultz said his email was a mistake and was incorrect as a matter of law.

On September 17, 2018, three days after the so-called settlement agreement was reached, Ocariz sent an email to Schultz, copying Brandt, Cosgrove, and Judge Scott. [ECF No. 237-6, p. 6]. The email was a response to Schultz's email, sent about 15 minutes earlier that morning, urging that parties get the term sheet "inked" that day. *Id.* Ocariz's email said that "[t]here are a lot of material terms that need to be addressed, such as the language in the releases and what may get included as part of any injunctive relief provision." *Id.* Cosgrove responded (later the same day) that "[t]erm sheets are standard operating procedure. . . . If your client has an issue with any of the terms outlined, please let us know ASAP. Otherwise we think it's fair to request that the parties execute the term sheet to ensure we are all on the same page." *Id.* at 26.

Brandt argued that materiality is a fact issue, not a legal issue, so there would have been no need for Schultz to conduct more research to see whether an enforceable agreement had been reached on September 14, 2018. According to Brandt, there was no agreement then on who the parties to the settlement agreement would be or the identities of the class members. He also posed a common-sense question about the practical problems that would arise from a lack of consensus on the language for injunctive relief: would the *Court* decide how to phrase the disclosure on the American website (about trip insurance)?

But Schultz branded this argument as an "improper doomsday argument," emphasizing that Brandt advised him, in an October 17, 2018 telephone call, that he expected a signed settlement agreement within a week.

Schultz also explained that no joint notice of settlement would have been filed on September 14, 2018 if Zamber and his counsel knew or understood that American or Allianz viewed the amount of attorney's fees as a condition precedent. He also emphasized that neither American nor Allianz had provided the Court with any contemporaneous documents evidencing an understanding as of September 14, 2018, that attorney's fees were a precondition to the settlement.

## VII.   Post-Hearing Developments

Slightly more than a week after the hearing, American filed a notice of supplemental authority: an unopposed motion for preliminary approval of class settlement and for certification of a settlement class, filed on February 15, 2019, in *Coleman v. CubeSmart*, 16-cv-25009-JEM, ECF No. 78. [ECF No. 265]. The supplemental authority notice pointed out that the same attorneys representing Zamber are the ones who filed the motion. The Undersigned, who is also the paired magistrate judge in that case, takes judicial notice of the fact that both cases are based on alleged deception involving insurance and a purported failure to disclose that the defendant (i.e., American or CubeSmart) had a secret financial interest in the insurance payment through a kickback, commission, or contractual arrangement with an insurance carrier.

American's notice says that the motion in the other class action lawsuit "supports American's position that certain terms in class action cases are material to all parties, were material (among others) to the settlement in this case, and those terms were not agreed on as of September 14, 2018." [ECF No. 265, p. 1].

In support of this position, American notes that the "summary of the settlement terms" section in the CubeSmart settlement motion (i.e., section B) expressly states, "[t]he following is a summary of the **material terms** of the Settlement." *Id.* (emphasis added). The CubeSmart motion, which American attached as an exhibit, identifies several material terms -- including the attorneys' fees and costs. *Id.* at 2.

Moreover, CubeSmart's motion contains a summary of a clear-sailing provision: "CubeSmart will not oppose Class Counsel's request for attorneys' fees of up to $1,370,362 and will not oppose Class Counsel's request for reimbursement of litigation costs and expenses of up to $11,000.00," adding that "[t]he parties negotiated and reached agreement regarding Attorneys' Fees and Expenses only after reaching agreement on all *other* material terms of the Settlement." [ECF No. 265-1, p. 10 (emphasis added)].

American's supplemental-authority notice also pointed out that the draft settlement documents that Zamber's counsel circulated on September 25, 2018 [ECF No. 237-3, pp. 48–80] contain similar language. Specifically, Zamber's first draft of the proposed order preliminarily approving class settlement says, "American will not

32

oppose Class Counsel's request for attorneys' fees of up to _____% of the Settlement Fund, plus reimbursement of litigation costs and expenses. The Parties negotiated and reached agreement regarding attorneys' fees and costs only after reaching agreement on all other material terms of the Settlement." [ECF No. 237-3, p. 58].

Finally, as noted above, the parties attended an unsuccessful mediation on April 23, 2019, after the hearing and the submission of briefs and supplemental authority.

## VIII.   Applicable Legal Standards and Analysis

State contract law governs settlement agreements, including supposedly oral ones, and there must be mutual assent as to the essential settlement terms for settlement agreements to be enforceable. *E.g.*, *Kolodziej v. Mason*, 774 F.3d 736, 741 (11th Cir. 2014). Courts have refused to enforce settlement agreements where the parties have not resolved all material terms. *See, e.g.*, *Murdoch Sec. v. Navarro Grp. Ltd., Inc.*, No. 08-60505-CIV, 2010 WL 11505556, at *6–7 (S.D. Fla. Jan. 27, 2010) (refusing to enforce a settlement agreement where versions of drafts differed regarding key terms, including payment and retention terms, and without "competent and substantial evidence of any specific agreement" on those terms thereafter); *Dows v. Nike, Inc.*, 846 So. 2d 595, 602 (Fla. 4th DCA 2003) ("The agreement did not become final and enforceable until the parties completed their negotiations on the language of the settlement questions and reduced them to writing in the final agreement.").

As the party seeking to enforce a purported settlement agreement, Zamber has

the burden of establishing assent by the opposing party." *Carroll v. Carroll*, 532 So. 2d 1109, 1109 (Fla. 4th DCA 1988). "The definition of 'essential term' varies widely according to the nature and complexity of each transaction and is evaluated on a case-by-case basis." *Lanza v. Damian Carpentry, Inc.*, 6 So. 3d 674, 676 (Fla. 1st DCA 2009)**.**

When determining whether there has been a meeting of the minds on all material terms, courts should distinguish preliminary negotiations from a final agreement. A Florida appellate court outlined some of the practical issues arising in an assessment of whether an enforceable contract was reached during negotiations:

> Preliminary negotiations or tentative and incomplete agreements will not establish a sufficient meeting of the minds to create an enforceable settlement agreement. Nor may an agreement be determined to be final where the record establishes that it is the intent of the parties that further action be taken prior to the completion of a binding agreement. Applications of these principles help assure that parties to litigation will not unintentionally be deprived of their access to a judicial determination, and that parties and their legal representatives will negotiate settlements without fear of unintentionally entering into a binding agreement.

*Williams v. Ingram*, 605 So. 2d 890, 893–94 (Fla. 1st DCA 1992) (internal citations omitted).

Moreover, "[w]here the parties intend that there will be no binding contract until the negotiations are reduced to a formal writing, there is no contract until that time." *Am. Capital Network v. Command Credit Corp.*, 707 So. 2d 874, 875 (Fla. 4th DCA 1998); *see also Club Eden Roc, Inc. v. Tripmasters, Inc.*, 471 So. 2d 1322, 1323–24 (Fla. 3d DCA 1985) (finding no contract where a party's "memorandum was clear that no rights or

obligations would arise between the parties until the execution of an agreement containing all the terms and conditions").

On the other hand, absent a specific requirement for a writing, oral settlement agreements can be enforced under appropriate circumstances. The law in the Eleventh Circuit is clear and unequivocal on this point: a court may enforce the terms of a settlement agreement when the parties have agreed upon all material terms, even when those agreements are oral. *See Brewster v. MSC Crociere, S.A.*, No. 14-60991-CIV, 2015 WL 13389793, at *3 (S.D. Fla. June 11, 2015) (explaining that authority to enforce settlement agreements "extends not only to written settlement agreements, but to oral agreements as well," and then enforcing an oral settlement agreement); *see also Welch v. N. Am. Tank Line, Inc.*, No. 8:06CIV2340 T 17 MAP, 2008 WL 3982394, at *2 (M.D. Fla. Aug. 25, 2008) (citing *Murchison v. Grand Cypress Hotel Corp.*, 13 F.3d 1483, 1485–86 (11th Cir. 1994)) ("A court is empowered to enforce oral settlement agreements.").

A written settlement agreement is not required when the parties have already agreed on material terms. *See Reed By & Through Reed v. United States*, 717 F. Supp. 1511, 1517 (S.D. Fla. 1988), *aff'd*, 891 F.2d 878 (11th Cir. 1990) (explaining that "the physical act of signing a document is a mere formality where the parties clearly intend to be bound" and then enforcing settlement agreement); *see also Lifecare Int'l, Inc. v. CD Med., Inc.*, 68 F.3d 429, 436 (11th Cir. 1995), *opinion modified and supplemented*, 85 F.3d 519 (11th Cir. 1996) ("[T]he parties['] intent, of course, is what ultimately controls. Simply because the

parties contemplated the drafting of a subsequent formal, written contract, does not denote that they did not intend to be bound immediately by their oral or written negotiations.").

Moreover, in *Murchison*, the Eleventh Circuit noted, "We favor and encourage settlements in order to conserve judicial resources." 13 F.3d at 1486. Florida's state courts have the same view. *Spiegel v. H. Allen Homes, Inc.*, 834 So. 2d 295, 297 (Fla. 4th DCA 2003) ("Settlement agreements are favored as a means to conserve judicial resources. Courts will enforce them when it is possible to do so.").

Also, Florida law does not automatically bar enforcement of a contract involving some amount of uncertainty. "[T]he Florida Supreme Court has observed that '[a]ll agreements have some degree of indefiniteness and some degree of uncertainty.'" *Brewster*, 2015 WL 13389793, at *5 (quoting *Blackhawk Heating & Plumbing Co., Inc. v. Data Lease Fin. Corp.*, 302 So. 2d 404, 409 (Fla. 1974)). "The law, however, does not favor, but leans against the destruction of contracts because of uncertainty; and it will, if feasible, so construe agreements as to carry into effect the reasonable intentions of the parties if that can be ascertained." *Id.* (internal quotations omitted).

To be sure, most of the Florida and Eleventh Circuit cases on settlements discussed by the parties in their memoranda are not class action lawsuits involving oral settlement agreements. Nevertheless, the law does not automatically prevent a court from enforcing an oral agreement to settle a class action lawsuit. Zamber has cited some

authority to support this view, albeit from out-of-circuit cases. *Schaffer v. Litton Loan Servicing, LP*, No. CV 05-07673 MMM JCX, 2012 WL 10274678 (C.D. Cal. Nov. 13, 2012); *Ramirez v. DeCoster*, 142 F. Supp. 2d 104 (D. Me. 2001).

Zamber does not argue that the parties did not intend to enter into a written settlement agreement. Instead, he candidly notes that Federal Rule of Civil Procedure 23(e)(3) requires the parties seeking approval of a proposed settlement must "file a statement identifying any agreement made in connection with the proposal." Fed. R. Civ. P. 23(e)(3). Moreover, Zamber's counsel circulated the first draft of a comprehensive set of settlement documents following the September 14, 2018 notice.

Framed by this orientation, Zamber argues that the case is similar to the factual scenario in *Schaffer*, where the defendant sought to enforce a settlement agreement that certain named plaintiffs refused to sign. The resistant plaintiffs there argued that while there had been an oral agreement on the financial terms of a settlement, and that they would provide releases to the defendant, there were open terms in the unsigned, global settlement agreement that made the settlement unenforceable. They claimed that revisions made between the parties to the draft written agreement -- after the oral settlement agreement was in place -- rendered the oral agreement void.

The Court disagreed, noting that none of the changes or disagreements between the parties as reflected in the written drafts changed the material terms to which the parties had orally agreed:

The drafts reworded the release and the class notice. No draft, however, contemplated modification of the fundamental terms to which the parties agreed on February 17, 2009, i.e., the total amount of the settlement, the release by plaintiffs of all class and individual claims, and incentive payments of $5,000 to the named plaintiffs for their participation in the litigation and the release of their individual claims. Thus, the court concludes that the parties agreed to the material terms of the settlement on February 17, 2009, despite their continued negotiation of the language of the written agreement to be provided to the court for purposes of Rule 23

*Schaffer*, 2012 WL 10274678, at *15.

Because the parties have vigorously disputed the issue of whether an agreement on the amount of attorney's fees was a material term of the so-called settlement agreement, the Undersigned notes that Eleventh Circuit law provides that attorney's fees in common fund class action cases are based upon the **court's** assessment of a reasonable percentage of the fund. *Camden I Condo. Ass'n, Inc. v. Dunkle*, 946 F.2d 768, 774 (11th Cir. 1991) ("Henceforth in this circuit, attorneys' fees awarded from a common fund shall be based upon a reasonable percentage of the fund established for the benefit of the class."). "The majority of common fund fee awards fall between 20% to 30% of the fund. *Id.*; *see Pinto v. Princess Cruise Lines, Ltd.*, 513 F. Supp. 2d 1334, 1342 (S.D. Fla. 2007) ("The 30% fee requested in this case is thus well in line with the bulk of the fee awards in class action litigation.").

Judge Martinez, the district judge presiding over this case, endorsed *Camden I* and followed its precedent in determining an attorney's fee award in a common fund class action case. *Francisco v. Numismatic Guar. Corp. of Am.*, No. 06-61677-CIV, 2008 WL

649124, at *13 (S.D. Fla. Jan. 31, 2008). As Judge Martinez explained, "[t]he common fund approach is . . . grounded on a policy of encouraging counsel to act as private attorneys general to vindicate the rights of class members, most of whom have small individual claims." *Id.* Judge Martinez then added, quoting *Camden I*:

> The proper manner to calculate attorneys' fees is to identify the fund created for the benefit of the class and to award counsel for the class a reasonable percentage of that fund as an attorneys' fee. In this circuit, "attorneys' fees awarded from a common fund shall be based upon a reasonable percentage of the fund established for the benefit of the class."

*Id.* (quoting *Camden I*, 946 F.2d at 774).

Based on the legal principles outlined above, the Undersigned concludes that the parties did **not** reach an enforceable oral settlement agreement of this putative class action lawsuit on September 14, 2108. Therefore, the Undersigned **respectfully recommend**s that Judge Martinez **deny** the motion to enforce, reinstate the case, and enter a new scheduling order.

Before listing the reasons supporting this conclusion, the Undersigned will first spotlight the issues on which I am *not* relying (even though the parties spent a considerable amount of time arguing the points).

First, the Undersigned is not relying on the argument that the Court cannot disagree with Judge Scott's October 2018 notice of impasse and must treat it as the final word on enforceability. The impasse might indicate that he viewed the attorney's fees dispute as a material term, but it might also suggest that he understood the practical

reality that an impasse had been reached because American and Allianz issued a flat-out directive that they would not settle without a clear-sailing agreement (of $2.5 million in fees).

Second, the Undersigned is not taking a position on whether American or Allianz had given their attorneys the requisite authority to settle on or before September 14, 2018. Instead, the Undersigned will assume, solely for the sake of discussion, that American's and Allianz's respective attorneys had the requisite authority to settle.

Third, the Undersigned is not accepting American's arguments that a lengthy list of myriad other terms includes only essential terms. Although some of them may well have been essential or material (while others clearly were not), the Undersigned need not decide that issue to make a recommendation.

Fourth, the Undersigned is not relying on the fact that the September 14, 2018, joint notice used the title "Notice of Settlement" as dispositive. The notice also advised that only the financial terms had been agreed to, that the agreement was only "in principle," and that further negotiations would occur. [ECF No. 211]. The Undersigned deems it unrealistic and unfair to focus only on the word "settlement" and avoid the other language that gives context to the filing and its title.

Fifth, and finally, the Undersigned is not concluding that it is legally impossible to reach a $25 million oral settlement of a putative class action involving, in part, injunctive relief (though I do acknowledge that it would be atypical and a challenge).

The purported settlement agreement that Zamber says was orally reached on September 14, 2018, did not mention Allianz and did not reveal whether Allianz would be a party to the settlement agreement. This alone is a dramatic and substantial omission of an essential term. Everyone understood that Allianz would be the sole funder of any settlement. In addition, Zamber's counsel directly negotiated with Allianz's counsel on several occasions, and the $25 million number came from Allianz, not American. But Zamber seeks to enforce a settlement agreement without seeking enforcement against Allianz. Zamber initially balked at including Allianz in a written settlement agreement but later seemed to acquiesce. Without an agreement as to Allianz's involvement in any settlement, however, there can be no settlement because Allianz's role is an essential term of any settlement agreement.

Moreover, the parties' failure to specifically agree on the nature and language of any injunctive relief as of September 14, 2018, is also a substantial issue. Because American's website is critical, it seems unworkable to reach a settlement agreement without an agreement about the specifics of the injunctive relief affecting its website.

The Undersigned also finds it significant that Zamber has taken significantly inconsistent positions. He argues that *all* essential material terms were agreed to by September 14, but then, in October, his counsel wrote that the parties were "nearly" at an agreement on material terms. [ECF Nos. 237, p. 13; 237-3, p. 375]. To provide another illustration, he refused to negotiate a clear-sailing provision or other agreement on fees

until the parties had reached a settlement -- yet he maintained that no-negotiation position through mid-October (even though he now says that there **was** an agreement in place a month earlier). A third example is Zamber's position on discovery, where he attempted to resume discovery in October even though he contends the case was settled in September.

In his motion to enforce, Zamber alleges that American and Allianz "chose to embark on an **eleventh hour** campaign to minimize their financial exposure with regard to the settlement." [ECF No. 238-1, p. 3 (emphasis added)]. The motion further alleges that American and Allianz waited until the Court's October 17, 2018 deadline for submission of the settlement papers to inform Zamber that American would retract the settlement unless Zamber's counsel agreed to limit their attorney's fees to 10% of the common fund (i.e., $2.5 million).

But the Undersigned is not swayed by this depiction. Zamber makes it seem as though October 17, 2018 was the first time that this issue was asserted and suggests that it was foisted on him and his attorneys by surprise. But Zamber's counsel knew since at least August 2018 that Allianz's position was that fees needed to be capped at $2.5 million. Zamber and his counsel simply chose to avoid confronting the issue directly. Indeed, from the perspective of American and Allianz, it might be Zamber and his counsel who generated a surprise regarding fees by announcing, for the first time in October, an intent to seek 25-30% of the common fund as a fee award.

Moreover, the Undersigned is not convinced that the amount of fees was not a material and essential part of a settlement agreement. Because of the reverter provision, the more the fees, the less money would be returned to American (and to Allianz, who would, as the funder, have been the ultimate beneficiary of a partial refund of the common fund). Conversely, the less the fees, the greater the amount of money returned to American (and Allianz). Given that Allianz refused to pay more than 10% (i.e., $2.5 million) and Zamber's counsel was urging a 30% recovery (i.e., $7.5 million), the lack of agreement created a potential $5 million difference in the amount that Allianz, the sole funder, would ultimately pay to settle this case.

The Undersigned has difficulty accepting the argument that an issue generating a $5 million swing in a $25 million settlement is not a material term. Perhaps it was not a material term to *Zamber*, but that does not mean it was not a material term to *American* or to the agreement itself. Zamber has the burden to establish that the oral settlement agreement covered all essential terms, and he has not done that on this point.

Zamber relies on case law suggesting that the amount of attorney's fees is not a material term to the settlement agreement, but American submitted contrary authority. *See Smalbein ex rel. Estate of Smalbein v. City of Daytona Beach*, 353 F.3d 901, 908 (11th Cir. 2003) (holding settlement agreement that conditioned award of attorney's fees and costs upon a court determination that the underlying claims had merit was "a material part of [the parties'] agreement"); *In re Zappos, Inc.*, No. 3:12-CV-00325-RCJ, 2015 WL

1414321, at *2 (D. Nev. Mar. 27, 2015), *aff'd sub nom.*, 714 F. App'x 761 (9th Cir. 2018) (finding no "binding settlement contract because the parties failed to have a 'meeting of the minds' on an essential term of the agreement—attorneys' fees"); *see also United States v. Lauckner*, 101 F. App'x 870, 872 (3d Cir. 2004) (holding that where the government's "acceptance" of a settlement offer added a provision that excluded attorneys' fees, the "acceptance" was actually a "rejection and a counter-offer").

Moreover, one of the cases Zamber relies on suggests that the amount of attorney's fees in a class action settlement **is** a material term. *See Dardarian v. OfficeMax N. Am., Inc.*, No. 11-CV-00947-YGR, 2014 WL 7463317, at *1 (N.D. Cal. Dec. 30, 2014) ("The parties eventually entered into a settlement agreement. In the process of reaching that agreement, they did not negotiate the amount of attorneys' fees and costs until after the **other** material terms of the settlement had been reached.") (emphasis added). In *Dardarian*, the Court noted that the parties had agreed, in the settlement agreement, "to a floor of $200,000.00 and a ceiling of $500,000.00 in attorneys' fees and costs," that the Court would then decide. *Id.* As such, the fees were a material term, and the parties expressly acknowledged that the Court would set the fee amount.

In the Undersigned's view, the mere fact that the Court, and not the parties, sets fees in a class action settlement and typically does so on a percentage basis does not mean that fees are not essential or material. Instead, it means that the parties can agree to make recommendations or take positions or agree to clear-sailing provisions or

otherwise attempt to provide a zone of attorney's fees that the Court would likely agree to when approving the settlement.

The absence of a clear-sailing provision, particularly in the face of objections by class members, may, if only indirectly, cause a court to significantly reduce a requested fee award. *See, e.g., In re Elan Sec. Litig.*, 385 F. Supp. 2d 363, 371–76 (S.D.N.Y. 2005) (reducing requested fee award from 20% to 12% of common fund where, among other factors, there were 17 objectors to the fee application and there was no indication in the opinion that the settlement contained a clear-sailing provision). Conversely, a clear-sailing provision may help counsel obtain his or her requested fee, even when faced with objectors. *See Montoya v. PNC Bank, N.A.*, No. 1420474CIVGOODMAN, 2016 WL 1529902, at *17 (S.D. Fla. Apr. 13, 2016) (approving requested 14.7% fee award and noting that "the Court takes no issue with the reversion of unclaimed funds to Defendants or the so-called 'clear-sailing' provision.").

Also, the fact that the fee award agreed to in a class action settlement was negotiated after the other material terms were agreed to does not mean that the amount of fees is not material. To the contrary, the after-the-fact negotiation of the fees is intended to show that the discussion was a fair one, done at arm's length, and that counsel did not engage in improper self-dealing.

For example, in *Burrows v. Purchasing Power, LLC*, a case cited by Zamber, the Court noted that fees were not discussed until after the material terms were negotiated

and reduced to a signed term sheet so as to establish the adequacy of class counsel. No. 1: 12-CV-22800, 2013 WL 10167232, at *5 (S.D. Fla. Oct. 7, 2013). Likewise, in *In re: Whirlpool Corp. Front-loading Washer Product Liability Litigation*, another case cited by Zamber, the Court mentioned the timing of the fees-and-costs negotiations to demonstrate that there was "no indicia in this case that the parties engaged in fraud or collusion to reach settlement." No. 1:08-WP-65000, 2016 WL 5338012, at *10 (N.D. Ohio Sept. 23, 2016).

The position taken by Zamber and his counsel on this point is inconsistent with the position counsel took recently in another class action lawsuit. The settlement there used an approach similar to the approach Zamber's counsel wanted to use here: agree on other material terms first and *then* negotiate the attorney's fees and costs. And that is exactly what they did in *Coleman v. CubeSmart* -- but the unopposed motion for preliminary approval of a class settlement (which counsel submitted) designated fees as a material term of the Settlement.

One final point about attorney's fees and Zamber's factually correct point that the Court decides the amount. While accurate, this point overlooks the value of an agreement to not oppose fees in a particular amount or range (i.e., a commitment by American and Allianz) or to limit the amount that would be sought (i.e., a commitment by Zamber). These types of agreements are significant even though a Court is free to not follow them.

Indeed, these types of agreements are deemed critical in other settings, such as the Court's determination of a criminal defendant's sentence. Most federal criminal cases are resolved through a plea agreement in which the parties agree that (1) they would make a joint recommendation to the Court about certain factors used when analyzing the advisory Sentencing Guidelines or (2) the United States would not oppose a certain Sentencing Guidelines argument asserted by the defendant. This second type of arrangement is akin to the criminal case version of a clear-sailing provision. The value of these agreements to take certain positions is so important that federal appellate courts will reverse a criminal sentence if the prosecutor failed to follow through on the Government's agreement to make a recommendation or to not object to a defense recommendation. *See United States v. Hunter*, 835 F.3d 1320, 1328 (11th Cir. 2016) (reversing sentence where Government breached plea agreement by failing to recommend acceptance-of-responsibility reduction at sentencing); *United States v. Haber*, 299 F. App'x 865, 868 (11th Cir. 2008) (same, where the Government "questioned the propriety of the plea agreement and did not make 'a forceful and intelligent recommendation for' a within-guideline sentence.").

If Zamber agreed to not seek fees more than 10%, then it is theoretically possible, but highly unlikely, from a practical perspective, that the award would exceed that amount (i.e., $2.5 million). If there were no such commitment and Zamber's counsel could seek fees of any amount and American could object, then the fees could exceed

$2.5 million, and the possibility of that would be more than strictly theoretical. Thus, American and Allianz have good grounds to insist on a percentage cap by Zamber's counsel because the absence of one could yield a difference of $5 million (or even more, should the fee request exceed 30% and be granted). That can't be deemed immaterial or collateral. The disagreement over this one provision is a clear-cut illustration of one material term not covered by the alleged oral settlement agreement.

## IX.    Conclusion

Zamber has not met his burden to establish that the parties agreed to all the essential terms of an oral $25 million class action settlement for damages and injunctive relief as of September 14, 2018. To be sure, the parties had agreed to several material terms. But they had not agreed on *all* material terms. And that reality is fatal to his motion.

It is, of course, true that Courts favor settlements and try to enforce them when appropriate. But that general goal hardly means that agreements on less than all essential terms should be enforced.

So for purposes of metaphorical consistency, the Undersigned will once again return to the colloquialism used at the start of the report: the fat lady (wearing an American logo, adorned with an Allianz pin) had certainly belted out a good deal of a settlement song by September 14, 2108, but she never completed all of her singing because no one agreed on all the lyrics of a material chorus of the settlement opera.

The Undersigned therefore **respectfully recommends** that Judge Martinez **deny** the motion to enforce, reinstate the case, and establish a new trial schedule.

## X.   Objections

The parties will have 30 days from the date of being served with a copy of this Report and Recommendations within which to file written objections, if any, with the District Judge. Each party may file a response to the other party's objection within 30 days of the objection.[7] Failure to file objections timely shall bar the parties from a de novo determination by the District Judge of an issue covered in the Report and shall bar the parties from attacking on appeal unobjected-to factual and legal conclusions contained in this Report except upon grounds of plain error if necessary in the interest of justice. *See* 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140, 149 (1985); *Henley v. Johnson*, 885 F.2d 790, 794 (1989); 11th Cir. R. 3-1 (2016).

**RESPECTFULLY RECOMMENDED** in Chambers, in Miami, Florida, on May 3, 2019.

Jonathan Goodman
UNITED STATES MAGISTRATE JUDGE

---

[7]   The Undersigned is increasing the objection and response periods from 14 days, each, to 30 days, each, because of the length of the report and the complexity of the issues.

49

**<u>Copies furnished to</u>:**
The Honorable Jose E. Martinez
All counsel of record