**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

CASE NO.:  16-23901-CIV-MARTINEZ/GOODMAN

KRISTIAN ZAMBER, on behalf of
himself and all others similarly situated,

<u>CLASS ACTION</u>

      Plaintiff,

v.

AMERICAN AIRLINES, INC.,

      Defendant.

_____/

**REPORT AND RECOMMENDATION ON**
<u>**PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**</u>

Plaintiff Kristian Zamber filed a Motion for Class Certification [ECF Nos. 311 and 312], which is ripe for a ruling. United States District Judge Jose E. Martinez referred the motion to the Undersigned. [ECF No. 318.] The Undersigned held a hearing on October 22, 2019. For the reasons below, the Undersigned respectfully recommends that the District Court **grant** the motion.

## I.   Factual and Procedural Background

On March 20, 2016, Plaintiff purchased trip insurance on Defendant American Airlines, Inc.'s ("American") website. [ECF No. 126-1 ¶ 4.] Plaintiff alleges that, on its website and throughout the online process of purchasing a flight ticket and trip insurance, American leaves consumers with the false impression that the charge for trip insurance is a pass-through fee, i.e., a fee that is passed on to a third-party insurer, Allianz Global Assistance ("Allianz"), and for which American has no financial interest. [ECF No. 296 ¶ 2.] Plaintiff alleges that in fact, however, Allianz pays American an undisclosed commission or "kickback" for every policy sold. [*Id.*]

Trip insurance is offered on American's "booking path," which is the online path that consumers proceed along when buying flight tickets on American's website. [ECF No. 401 ¶¶ 12–13.] Within the booking path, an offer of trip insurance is presented in an "offer box." [*Id.* ¶ 14.] While American contends that the content of the offer box has varied based on time and customer segment, it is clear from American's own examples that, regardless of other variations, for all consumers the offer box uniformly contained the following characteristics. Featured at the top of the offer box is a graphic with a logo for Allianz; there is never an American logo. [ECF No. 352-3 at 2–5] The offer box always uses the word "Recommended" in connection with the trip insurance. [*Id.*] And there is always a "**Yes**" (always first and in bold type) or "No" option regarding the purchase of trip insurance. [*Id.*] A consumer cannot buy a ticket on American's website without encountering the offer box and choosing "**Yes**" or "No." [ECF No. 296 ¶ 14.]

1

Most importantly, it is undisputed that the offer box on American's booking path has at all material times (i.e., since at least four years before this action was filed) *uniformly* contained the following representation: The insurance is offered by a third party, Allianz Global Assistance, "**not American Airlines**." [ECF No. 352-3 at 2–5] (emphasis added); *see* [ECF No. 395 at 29:10–20, 74:13–75:1] (American's counsel conceding that every variation uniformly contained this representation). Plaintiff contends that the net impression a reasonable consumer would take from the offer box, including the uniform representation that the trip insurance is not offered by American, is the false impression that the premium for the trip insurance paid through American's website is a pass-through charge for which American has no financial interest.

Plaintiff also alleges that this net impression is furthered by the fact that state laws generally prohibit the unlicensed sale and brokerage of insurance, which includes the payment or receipt of commissions on sales of insurance. [ECF No. 296 ¶¶ 29–31, 34, 44–45]; [ECF No. 391-2] ████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████.[1] In other words, Plaintiff asserts a reasonable consumer would not expect American to be paid a commission on the trip-insurance sale because it would

---

[1] It appears this list is not exhaustive. *See, e.g.*, Ga. Code Ann. § 33-23-4(b) ("No insurer or agent . . . shall pay, directly or indirectly, any commissions or any other valuable consideration to any person for services as an agent, subagent, or adjuster within this state, unless such person is duly licensed in accordance with this article."); La. Rev. Stat. § 22:1598 ("Any compensation received by the person making a referral . . . shall not be in the form of a sales commission and shall not be based on the application by the customer or purchase of insurance."); Va. Code § 38.2-1812(a) ("No insurer shall pay directly or indirectly any commission or other valuable consideration to any person for services as an agent or a surplus lines broker within this Commonwealth unless the person is then a duly appointed agent of such insurer and, at the time of the transaction out of which arose the right to such commission or other valuable consideration, held a valid license as an agent, or valid license as a surplus lines broker, for the class of insurance involved.").

be illegal. In fact, Plaintiff alleges that "one reason [American] attempts to hide its role in the travel insurance program through false statements on its website" is that it "knows that it lacks the required license to transact the business of insurance in any state." [ECF No. 296 ¶¶ 2, 25, 28.]

It is also undisputed that when a consumer buys trip insurance on American's website, the premium is not bundled with the ticket price as part of the airfare bill (i.e., the money expected to go towards American's revenue); rather it is itemized separately. [*Id.* ¶ 36.] This contrasts with the election of other "add ons," which are included as part of the listed fare rather than set out separately. [*Id.*] Plaintiff alleges that this furthers the impression that the premium is a pass-through charge. Purchases for things that American sells and generates revenue from—tickets, seat selection, priority boarding, etc.—are bundled together in one combined fare while the insurance premium is separately itemized because it is not part of American's revenue. It is undisputed that this uniquely separate itemization of the premium is also uniform for every consumer who purchases trip insurance through American's website. [ECF No. 395 at 77:12–78:15.]

According to Plaintiff, the net impression of certain statements alone, and of all the representations and omissions on American's booking path and website together, is that the premium for trip insurance is a pass-through charge, i.e., American does not receive a portion of the charge. [ECF No. 296 ¶¶ 2, 31, 33, 39, 43, 47.] But Plaintiff contends that this impression is false because Allianz pays American—what Plaintiff alleges is a commission or "kickback and what the "Marketing Agreement" between Allianz and American calls an "Advertising Fee"— each time a consumer purchases a policy. [*Id.* ¶ 2; ECF No. 182-1 at 111:24–112:15; ECF No. 182-8 §§ 2.1, 2.3, 3.2, 12.12, Ex. B-1.] American has never disclosed its profit interest in the sales of trip insurance to any of its consumers. [ECF No. 182 ¶ 50; ECF No. 312-1.]

Plaintiff points to American's emails, which show that American knows it ███████████

████████████████████████████████████████████████████ and █████████████████████

███████████████████████████████ [ECF Nos. 296-5; 296-1.] Plaintiff also cites the

Regulatory Settlement Agreement that the primary underwriter of policies sold on American's

website, Jefferson Insurance Company ("Jefferson"), entered into with state regulators. In that

agreement, Jefferson *agreed* that travel retailers such as American must have a license to receive

commissions. [ECF No. 311-2 at 8.] Plaintiff also notes that American seems to admit in emails

that it acts as a broker and that Allianz's payments are commissions paid out of premiums.[2]

Plaintiff asserts that American, together with Allianz and other insurance entities, is part

of an illegal enterprise that fraudulently conceals American's receipt of commissions because such

commissions are illegal. Specifically, Plaintiff alleges that American and the other parties to this

enterprise conceal the true nature of the commissions by disguising them as "marketing fees" under

the Marketing Agreement even though the payment-provisions of the agreement are not followed

in reality and American really receives as much as a 50% commission per trip-insurance policy

sold on its website. [ECF No. 296 ¶ 106.] For example, while the "Marketing Agreement" avoids

using the word "commission," communications between American employees and between

---

[2] [ECF No. 296-4] ████████████████████████████████████████████████████████

███████████████████████████████████; [ECF No. 296-5] █████████████████████████

████████████████████████████████████ [ECF No. 296-6] █████████████████████████

███████████████████████████████████████████████████████████████████████████████

██████████████████████████████████████ [*id.*] ██████████████████████████ [ECF No.

296-7] █████████████████████████████ Plaintiff further highlights statements in

American's internal emails that contradict statements that American *uniformly* makes to

consumers on its website. *Compare* [ECF No. 296-6] ████████████████████████████

███████████████████████████████████████████████████████████████████████████████

██████████████████████████ *with* [ECF No. 352-3 at 2–5] ("This insurance is

***offered by a third party***, Allianz Global Assistance, ***not American Airlines***."); *compare also* [ECF

No. 296-2 at 19] ███████████████████████████████████████████████████████████████,

████ [ECF No. 296-10 at 10] ("Trip insurance products are ***sold by third-party insurance***

***providers, not American*** . . . .") (all emphases added).



American and Allianz routinely █████████████████████████ [ECF No. 182 ¶ 41];
[ECF No. 296-5] █████████████████████████████████████

████████████████████████████████████████████████████████

██████████ And the so-called "Advertising Fee" that Allianz pays American is █████████

█████████████████████████████████████████ [ECF No. 182 ¶ 42.]

Plaintiff also alleges that American and the enterprise conceal the illegal commissions through the

"fraudulent" statements on American's website discussed *supra*. [ECF No. 296 ¶¶ 102–03.] In

fact, for regulatory reasons, ███████████████████████████████████████

███████████████████████████████████ [ECF No. 312-4]

████████████████████████████████████

Finally, Plaintiff alleges that, although the insurance entities involved in the trip insurance

are required to disclose a list of their brokers or agents to various state regulatory authorities, their

submissions fraudulently omit American even though American acts as a broker and receives

commissions. [ECF No. 296 ¶¶ 108–15.] For example, Plaintiff points to Jefferson's disclosure to

the Florida Department of Financial Services, which omits any reference to American. [ECF No.

311-5.] Plaintiff alleges that this defrauding of regulators allows the "illegal" scheme to continue.

On September 12, 2016, based on the above-discussed "kickback" scheme, Plaintiff filed

this class action against American asserting state-law claims. Two years later, the parties almost

settled. On September 14, 2018, the parties filed a joint notice of settlement stating that they

"reached an agreement in principle on the financial terms of a class settlement." [ECF No. 211.]

Ultimately, the settlement fell through and Plaintiff moved to enforce it. Finding that the parties

had not yet agreed on all material terms, the Undersigned issued a report and recommendation that

the motion should be denied, which the District Court adopted. [ECF Nos. 279, 282.]

Shortly afterward, Plaintiff filed the operative amended complaint, in which he asserts state-law claims for (1) violation of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), (2) unjust enrichment, and (3) violation of Florida's Civil Remedies for Criminal Practices Act ("Florida RICO") and federal claims under the Racketeer Influenced and Corrupt Organizations Act ("RICO"). Plaintiff asserts that hundreds of thousands of other consumers like him purchased trip insurance on American's website during the applicable limitations period and American received an undisclosed and illegal commission or kickback for each policy sold.

Plaintiff now moves to certify two classes. As to his state-law claims, he moves to certify a class of all Florida persons who purchased trip insurance on American's website within the limitations period. As to his federal claims, he moves to certify a class of all persons nationwide who purchased trip insurance on American's website within the limitations period. He also moves to be appointed class representative, and for León Cosgrove, LLP to be appointed class counsel.

## II. Applicable Legal Principles and Analysis

### A. Standards for Class Certification and Impropriety of "Merits" Considerations

A class should be certified when the plaintiff has standing and the putative class meets the four requirements of Rule 23(a)—numerosity, commonality, typicality, and adequacy—and at least one of the alternative Rule 23(b) requirements. Fed. R. Civ. P. 23(a), (b).

Plaintiff contends—and the Undersigned agrees—that many of American's arguments challenge the merits of Plaintiff's claims, not their suitability for class adjudication. While a court may consider the factual record in connection with the class-certification requirements, a substantive analysis of the merits of claims or defenses is inappropriate on class certification. Fed. R. Civ. P. 23(c)(1)(A) advisory committee note (2003) ("[A]n evaluation of the probable outcome on the merits is not properly part of the certification decision."); *Amgen Inc. v. Conn. Ret. Plans*

6

& *Tr. Funds*, 568 U.S. 455, 459 (2013) ("Rule 23(b)(3) requires a showing that *questions* common to the class predominate, not that those questions will be answered, on the merits, in favor of the class."); *Drayton v. W. Auto Supply Co.*, 2002 WL 32508918, at *6 (11th Cir. Mar. 11, 2002); *Reyes v. BCA Fin. Servs., Inc.*, No. 16-cv-24077, 2018 WL 3145807, at *7 (S.D. Fla. June 26, 2018) (Goodman, M.J.). The purpose of a class-certification ruling "is not to adjudicate the case," but "to select the 'metho[d]' best suited to adjudication of the controversy." *Amgen*, 568 U.S. at 460. Adjudicating the merits to determine certification "put[s] the cart before the horse." *Id.*

That does not mean that elements of the claims or defenses are irrelevant to class certification. But the analysis is limited to whether they are subject to common or individualized proof, not whether a particular claim or defense will ultimately be successful. As one illustrative example, in opposing class certification, American repeatedly points to what it calls "expert survey research," which American contends demonstrates that the representations at issue were immaterial or not misleading to consumers. But on a motion for class certification, that is beside the point. If valid,[3] that defense would potentially bar *every* class member's claim. That militates *in favor of* certification, not against it. *See Amgen*, 568 U.S. at 460 ("As to materiality, therefore, the class is entirely cohesive: It will prevail or fail in unison."); *see also id.* at 466–70.

Indeed, the Eleventh Circuit recently held it is an abuse of discretion to deny certification based on a "defense [that] raised a question common to all class members." *Sellers v. Rushmore Loan Mgmt. Servs., LLC*, 2019 WL 5558082, at *6, -- F.3d -- (11th Cir. Oct. 29, 2019). The issue on class certification is not whether a defense will succeed, but whether it is subject to common proof (like American's "expert survey research"), and if not, whether it will require "a great deal

---

[3] Plaintiff filed a *Daubert* challenge to this "expert survey research." [ECF No. 404.] Also, whether a reasonable consumer would be deceived by American's representations is "a question of fact for a jury." *Zamber v. Am. Airlines, Inc.*, 282 F. Supp. 3d 1289, 1300 (S.D. Fla. 2017).

of individualized proof." *Id.* at *6; *see id.* at *8 ("We caution that we express no opinion today about whether Rushmore's defense is meritorious. . . . Our decision today is limited to the conclusion that this defense raises questions common to all class members."). The Undersigned will thus analyze merits issues "only to the extent [] they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied.'" *Reyes*, 2018 WL 3145807, at *7.

### B. Standing

The Undersigned first addresses standing, which American does not dispute in its opposition brief. The Undersigned and the District Court have already held that Plaintiff alleged facts demonstrating standing to assert his claims. *Zamber*, 282 F. Supp. 3d at 1297–98.[4] And these are no longer just allegations. Plaintiff actually purchased trip insurance on American's website. [ECF No. 400 ¶ 52.] At the time of this purchase, American's website contained the representations and omissions at issue, and the Marketing Agreement between American and Allianz was in effect. [*Id.* ¶ 25; ECF No. 352-3 at 2–5; ECF No. 395 at 29:10–20, 74:13–75:1.] There is thus factual support in the record that American received payment from Allianz in connection with Plaintiff's purchase of trip insurance and that, if successful, Plaintiff will recover the portion of his premium that was the alleged commission or kickback. Therefore, Plaintiff has standing.

### C. Ascertainability

Ascertainability is a "narrow inquiry" that is satisfied when "the class definition contains objective criteria that allow for class members to be identified in an administratively feasible way." *Reyes*, 2018 WL 3145807, at *9, 11. All Plaintiff must show is "an administratively feasible method by which class members can be *identified*." *Id.* ("Nothing more, nothing less."). Here, all

---

[4] This was a ruling on Plaintiff's original complaint, but the same standing analysis applies to the claims in the amended complaint, including the new state and federal RICO claims.

Florida and nationwide purchasers of trip insurance on American's website can be identified in an administratively-feasible way because Allianz can provide a list of such purchasers since September 2012. [ECF Nos. 311-6; 369-3.] The classes are thus ascertainable. *Reyes*, 2018 WL 3145807, at *10 (class ascertainable where available records are "useful for identification purposes"). While Allianz's records alone satisfy ascertainability, the Undersigned also cannot shut his eyes to American's "agree[ment] in principle" to a settlement that required identifying class members nationwide. Although it fell through, if class members could have been identified in an administratively-feasible way then, there is no reason they cannot be identified now.

American challenges ascertainability on the ground that the proposed classes are overbroad because they include purchasers that have what American claims are individualized causation or damages issues. For example, it argues that the proposed classes should not include purchasers who did not see the allegedly-offensive language. Such arguments misunderstand ascertainability. Again, "ascertainability is a *narrow* inquiry." *Id.* at *9 (emphasis added). Courts (and litigants) should not "commingle the administrative-feasibility requirement with any other Rule 23 requirement." *Id.* When considering ascertainability, a court "*only considers whether class members can be identified at all*, at least in any administratively feasible (or manageable) way." *Id.* (quoting *Miller v. Wells Fargo Bank, N.A.*, No. 16-cv-21145, 2017 WL 698520, at *4 (S.D. Fla. Feb. 22, 2017)). Rather than address that narrow inquiry, American takes issue with the ability of individuals in the proposed classes to ultimately succeed on their claims. That is not the standard. Indeed, "the Eleventh Circuit has made clear that 'manageability concerns that a court might face *after* class members have already been identified—*for example, concerns about whether particular class members are entitled to relief in light of individualized reliance, causation, and damages issues*' is more properly considered under Rule 23(b)(3)." *Miller*, 2017

WL 698520, at *4 (emphasis added) (quoting *Karhu v. Vital Pharm., Inc.*, 621 F. App'x 945, 950

(11th Cir. 2015)).[5] In any event, "certification is not precluded simply because a class may include

persons who have not been injured by the defendant's conduct." *Reyes*, 2018 WL 3145807, at *14.

Because American's "overbreadth" objections improperly conflate predominance with

ascertainability, the Undersigned will address them *infra* with respect to predominance. But

American raises no real challenge to ascertainability; it does not address *whether the people within*

*Plaintiff's proposed class definitions can be identified at all* in an administratively-feasible way.[6]

As discussed *supra*, they can. Therefore, the classes are ascertainable.

### D. Rule 23(b)(3)'s Requirements

The Undersigned addresses Rule 23(b)(3) before the Rule 23(a) requirements because most

of American's arguments (even if labeled otherwise) are really objections to predominance and

some issues overlap. *See Carriuolo v. Gen. Motors Co.*, 823 F.3d 97, 985 (11th Cir. 2016)

("Because plaintiffs will necessarily satisfy the commonality requirement if they can show

predominance, we begin with the predominance test.").

### 1. Predominance

To show predominance, "a plaintiff must establish that the issues subject to generalized

---

[5] American relies on cases finding classes overbroad for including people with individualized causation or damages issues. *O'Neill v. Home Depot U.S.A., Inc.*, 243 F.R.D. 469, 477–78 (S.D. Fla. 2006); *Williams v. Nat'l Travel Servs., Inc.*, No. 07-cv-60257, 2007 WL 9710723, *3 & n.6 (S.D. Fla. Dec. 11, 2007). But these cases predate *Karhu*'s clarification that "whether particular class members are entitled to relief in light of individualized reliance, causation, and damages issues" is *not* part of the ascertainability analysis. 621 F. App'x at 950.

[6] American's reliance on *Randolph v. J.M. Smucker Co.* is thus misplaced. Certain aspects of that case made self-identification unreliable, and the plaintiff failed to propose another feasible way to identify class members. 303 F.R.D. 679, 685–89 (S.D. Fla. 2014). That is not the case here, where a reliable list of purchasers is available and Plaintiff is not relying on self-identification. More relevant here is *Randolph*'s holding that "the fact that some class members may not have actually relied on the alleged misrepresentation does not render the class unascertainable." *Id.* at 692.

proof in the class action, and thus applicable to the class as a whole, predominate over those issues that are subject only to individualized proof." *Reyes*, 2018 WL 3145807, at *15. Common issues predominate if they have "a direct impact on every class member's effort to establish liability and on every class member's entitlement to injunctive and monetary relief." *Klay v. Humana, Inc.*, 382 F.3d 1241, 1254 (11th Cir. 2004), *abrogated in part on other grounds by Bridge v. Phx. Bond & Indem.Co.*, 553 U.S. 639 (2008). It is "not require[d] that *every* issue in the case be susceptible of common proof. So long as 'one or more of the central issues in the action are common to the class and can be said to predominate,' certification is proper." *In re Delta/AirTran Baggage Fee Antitrust Litig.*, 317 F.R.D. 675, 682 (N.D. Ga. 2016). "Considering whether 'questions of law or fact common to class members predominate' begins, of course, with the elements of the underlying cause of action." *Erica P. John Fund, Inc., v. Halliburton Co.*, 563 U.S. 804, 809 (2011). Accordingly, the Undersigned will analyze predominance with respect to each claim.

### a. *FDUTPA*

The crux of this case—the central, *predominant* question—is "[w]hether a reasonable consumer would interpret American's representations [or omissions] to mean that the trip insurance premium is a 'pass through' charge." *Zamber*, 282 F. Supp. 3d at 1300 & n.8. In other words, whether the representations and omissions on American's website were "deceptive." That is the first of the three elements of Plaintiff's FDUTPA claim: "(1) a deceptive act or unfair practice; (2) causation; and (3) actual damages." *Carriuolo*, 823 F.3d at 983. Critically for class certification, whether an act is "deceptive" is determined by an *objective* test: "the plaintiff must show that 'the alleged practice was likely to deceive a consumer acting reasonably in the same circumstances.'" *Id.* at 983–84. Because FDUTPA claims are determined by an objective "reasonable consumer" standard, plaintiffs "need not show actual reliance on the representation or

omission at issue." *Id.* at 984. The lack of a subjective reliance component means this "FDUTPA element is amenable to class-wide resolution." *Id.* at 986. Indeed, since a "reasonable consumer" standard governs, "[t]he standard of proving that an act is deceptive and, therefore, a violation of [FDUTPA] *is the same* in a class action as it is in an action initiated by an individual consumer." *Davis v. Powertel, Inc.*, 776 So. 2d 971, 974 (Fla. Dist. Ct. App. 2000) (emphasis added).

Whether the defendant's practice was deceptive is the very same common question that the Eleventh Circuit held satisfied predominance in *Carriuolo*. 823 F.3d at 985. Like in *Carrioulo*, predominance is satisfied here because the first element of Plaintiff's FDUTPA claim is subject to generalized proof. As discussed *supra*, American's website bore *uniform* characteristics in connection with all class members' purchases of trip insurance on American's website. Every offer box contained only an Allianz logo, not an American logo. [ECF No. 352-3 at 2–5.] Every offer box used the word "Recommended" in connection with the trip insurance. [*Id.*] And every offer box represented: The insurance is *offered by a third party*, Allianz Global Assistance, "*not American Airlines.*" [*Id.*] (emphasis added). Also, for every purchase of trip insurance on American's website, the premium was separately itemized in contrast to all other charges, which were bundled in one fare. [ECF No. 296 ¶ 36; ECF No. 395 at 77:12–78:15.][7]

Furthermore, the unlicensed sale or brokerage of insurance is illegal in Florida, *see* Fla. Stat. §§ 624.401, 626.112(9); Fla. Admin. Code r. 69O-222.030, and American admits that Florida law ████████████████████████████████████████████ [ECF No. 391-2].

---

[7] Moreover, Plaintiff has a FDUTPA claim based on a deceptive omission in addition to a deceptive representation. "A jury could find that the omission of American's alleged profit interest is deceptive here because American 'recommends' that the customer purchase travel insurance and provides a list of '[t]op reasons to buy trip insurance.'" *Zamber*, 282 F. Supp. 3d at 1300 n.8. This theory of liability is also subject to class-wide, generalized proof. Whether the omission would be deceptive to a reasonable consumer is answered the same way for each class member.

This context is also relevant to whether a reasonable consumer would be left with the impression that American was not receiving payments from Allianz in connection with sales of trip insurance, and it does not vary by class member. Because FDUTPA is subject to an objective "reasonable consumer" standard, it matters not whether individual class members knew that it was illegal for American to be paid commission. All that matters is whether a reasonable consumer would know.

Indeed, a "reasonable consumer . . . is deemed to know all applicable laws." *In re Motor Fuel Temp. Sales Practices Litig.*, No. 06-7621, 2013 WL 3795206, at *20 (D. Kan. July 19, 2013); *see also Edwards v. United States*, 334 F.2d 360, 367 (5th Cir. 1964) ("It is elementary that every one is presumed to know the law of the land, whether that be the common law or the statutory law . . . ."); *Hughes v. Plumsters Ltd.*, No. C-88-3512, 1989 WL 418804, at *2 (N.D. Cal. Aug. 28, 1989) (whether "the reasonable consumer knows the intricacies of copyright law . . . is yet another issue to be presented to the jury when determining likelihood of confusion").[8] Thus, the legality of commissions is also proof applicable to all class members' claims for the jury to consider.

The *Carriuolo* court also held that the other elements of FDUTPA are *objective* and, "because the injury is not determined by the plaintiffs' subjective reliance on the alleged inaccuracy, causation and damages may also be amenable to class-wide resolution." 823 F.3d at 986. In a pass-through case, such as here, causation and damages are also not individualized because they "are shown by the fact that Plaintiff parted with money for what should have been a 'pass through' charge [to a travel insurer] but that was instead kept by American." *Zamber*, 282 F. Supp. 3d at 1300; *see also Morgan v. Pub. Storage*, No. 14-cv-21559, 2015 WL 11233111, at *1

---

[8] *See also United States v. Walden*, 478 F. App'x 571, 576 (11th Cir. 2012) ("[E]veryone is presumed to know the law . . . ."); *Price v. La. Rural Rehab. Corp.*, 134 F.2d 548, 550 (5th Cir. 1943) ("Knowledge of appellant's incapacity to make a valid lease of the property was imputed to both parties, each being presumed to know the law . . . .").

(S.D. Fla. Aug. 17, 2015) ("FDUTPA claims exist where the alleged deceptive practice is defendant's misrepresentation of why a fee is being charged and where the money for the fee is being transferred."); *Latman v. Costa Cruise Lines, N.V.*, 758 So. 2d 699, 703 (Fla. Dist. Ct. App. 2000) ("[D]amages are sufficiently shown by the fact that the passenger parted with money for what should have been a 'pass-through' port charge, but the cruise line kept the money."); *Turner Greenberg Assocs. v. Pathman*, 885 So. 2d 1008, 1009 (Fla. Dist. Ct. App. 2004) (affirming class certification and holding that "an appropriate measure of damages is the undisclosed profit").

Causation and damages may also independently be met on a classwide basis if it shown that American would not have been able to receive commissions without deceptively presenting the premium as a pass-through charge. As discussed *supra*, it is illegal to broker insurance and receive commissions without a license. American recognized this in its own internal emails and in emails with Allianz. Because of this, American *required* that ███████████████████ ████████████████████████████████████████████████████████ ███████████████████████████████ [ECF No. 312-4] ████████████████████ These emails are also generalized proof of causation. But for this representation, American would not be able to secretly receive the commissions in the first place.

As noted *supra*, American's "overbreadth" objections are actually predominance objections. The Undersigned addresses them now. American contends that individualized issues predominate because each class member would have to show that she is not someone (1) who did not see the allegedly-offensive language, (2) who assumed or did not care that American was compensated by Allianz, (3) who decided to purchase trip insurance before visiting American's website, (4) who are "sophisticated buyers," (5) who are not financially responsible for the trip insurance, or (6) who did not purchase their trip insurance on the booking path but instead made

their purchase upon a later return to the website after buying their ticket. According to American, such purchasers cannot be included in the class because they cannot show causation.

These arguments lack merit. The Eleventh Circuit rejected almost identical arguments made by General Motors in *Carriuolo*: that individualized issues predominated because the buying experiences of each proposed class member were not uniform, some class members may have known that the safety ratings were inaccurate, some may not have been aware of the Monroney sticker, and each member negotiated the purchase or lease price individually with the dealer from whom the member purchased or leased the vehicle. 823 F.3d at 985. The Eleventh Circuit held that these issues were irrelevant because a FDUTPA claim is determined by an objective standard so actual reliance was unnecessary and "the mental state of each class member is irrelevant." *Id.*

American's arguments echo those rejected in *Carriuolo*. Whether a class member actually saw the representation is irrelevant. Not only did the Eleventh Circuit generally hold that subjective reliance is not required, it expressly stated General Motors was "incorrect to suggest that the plaintiffs must prove that every class member *saw the sticker* and was subjectively deceived by it," as this was simply "a reliance inquiry by another name." *Id.* (emphasis added). Whether a class member is a "sophisticated buyer" was also expressly held by the Eleventh Circuit to be irrelevant: "A class member's subjective sophistication or knowledge is irrelevant because the liability inquiry states objective elements." *Id.* at 990. Likewise, it does not matter whether a class member assumed or did not care that American was compensated by Allianz. Again, "the mental state of each class member is irrelevant." *Id.* at 985. American's argument here mirrors that of General Motors that some class members "may have known that the safety ratings were inaccurate." *Id.*[9]

---

[9] Likewise, it does not matter whether a class member decided to purchase trip insurance before visiting American's website. Causation is met by the payment of what a reasonable consumer would falsely believe to be a pass through charge. American's argument here is similar to the one

15

American's argument that some purchasers did not purchase their trip insurance on its booking path but instead made their purchase upon a later return to the website after already buying their ticket is also meritless for several reasons. First, American provides no evidence that this is a real issue or that a significant number of consumers purchased trip insurance at a later time than their flight ticket. *Reyes*, 2018 WL 3145807, at *14 ("[A]lthough BCA *says* that a 'B' flag may have meanings other than to indicate a 'wrong number,' BCA presents no *evidence* of any actual phone number that was coded with a 'B' flag to indicate something *other than* a wrong number."). Second, even if a large number of purchasers fell in this category, it would not matter. Such purchasers would still have been presented with the offer box on American's website, even if they selected the "No" option and returned to the website later to buy trip insurance. A consumer cannot buy a ticket on American's website without encountering the offer box. [ECF No. 296 ¶ 14.] Third, this argument is merely a variation of General Motors' rejected argument that "the buying and leasing experiences of each proposed class member were not uniform." *Carriuolo*, 823 F.3d at 985. Just as different car-buying experiences did not matter because each car had the same sticker, different trip-insurance buying experiences—including the variations of the offer box—do not matter because the offer box for each consumer contained the same representations and omissions that form the basis of Plaintiff's claims. *Id.* at 986. ("Because every class member here purchased or leased the same model vehicle with the same Monroney sticker attached, it does not matter that there may have been differences among the class members' subjective reliance.").

---

rejected in *Latman* "that absent some indication that the consumers were influenced in some way by the port charges, there is neither reliance nor resulting damage under FDUTPA." 758 So. 2d at 702–03 ("We would not hesitate to say that an intentional overcharge of sales tax, which is kept by the company itself, is an unfair and deceptive trade practice and that the consumer must be repaid. That is so even though the consumers clearly were willing to pay the price charged . . . nor would it make a difference that the consumers paid no attention to the sales tax amount.").

American also contends that purchasers "who are not financially responsible for the trip insurance" cannot be part of the class, and determining who those people are requires adjudication of individualized issues. Not so. Allianz has a record of who *paid* the premium for each trip insurance policy offered on American's website. The payer is the class member. American claims that some of payers may have been reimbursed by their employers or others. But that is between the class member and her employer. It does not change the fact that, at the point of sale, the purchaser was charged on her credit card and was damaged by paying what was (allegedly) falsely represented to be a pass-through fee. *Id.* at 987 ("The injury occurs at the point of sale . . . ."). If American's argument were accepted, it would end all class actions. For any case, a defendant could argue that there is no way to know whether some third party reimbursed the class member for the charge at issue. An after-the-injury reimbursement is simply irrelevant to class member status.[10]

The only potentially individual inquiry is the amount of damages for each class member: the amount of the alleged "commission" may have varied for different purchases. But that can easily be determined from American and Allianz's records. And regardless, "individualized damages calculations are insufficient to foreclose the possibility of class certification, especially when, as here, the central liability question is so clearly common to each class member."

---

[10] American also asserts that whether a class member "financially benefited" from their insurance by filing claims under their policy is an individualized issue because those purchasers could not have been damaged. Again, not so. A class member who pays a charge deceptively represented to be a pass-through suffers an injury in the amount of the portion of the charge that was not actually a "pass-through." That is so whether or not the class member obtains some benefit from the product she purchased. And again, a FDUTPA "injury occurs at the point of sale." *Id.* Whether Allianz paid an insurance claim under a trip-insurance policy has no effect on the alleged damages incurred when the purchaser bought the policy. American's reliance on *O'Neill* is misplaced because, in that case, part of the plaintiff's claim was that the coverage for the "damage waivers" being sold were worthless because they contained exclusions that negated the coverage being provided. 243 F.R.D. at 471. Due to the nature of the claim, whether a putative class member actually received benefits from the damage waiver was relevant to each class member's claim. *Id.* at 477–78. But here, a payment by Allianz under the policy has nothing to do with Plaintiff's claims.

*Carriuolo*, 823 F.3d at 988; *see also In re Delta*, 317 F.R.D. at 682. Also, under Plaintiff's liability theories, the damages here are easily computable. They are the undisclosed commissions to American. Allianz and American calculate those amounts on a regular basis and maintain a record of each consumer's purchase. "Because that [damages] theory is consistent for all class members, the predominance requirement under Rule 23(b)(3) is satisfied." *Carriuolo*, 823 F.3d at 989.

### b. *Unjust Enrichment*

Courts certify unjust-enrichment classes, even where multiple states' laws are at issue (unlike here, where Plaintiff seeks to certify only a Florida class). *In re Terazosin Hydrochloride Antitrust Litig.*, 220 F.R.D. 672, 698 n.4 (S.D. Fla. 2004) (certifying 17-state unjust-enrichment subclass for claim that defendants "were unjustly enriched by . . . illegal overcharges"). "Unjust enrichment claims can be certified for class treatment where there are common circumstances bearing on whether the defendant's retention of a benefit received from class members was just or not." *In re Checking Account Overdraft Litig.*, 286 F.R.D. 645, 657 (S.D. Fla. 2012).

The elements of unjust enrichment are "first, the plaintiff has conferred a benefit on the defendant; second, the defendant voluntarily accepted and retained that benefit; and, finally, the circumstances are such that it would be inequitable for the defendants to retain the benefit without paying for it." *Zamber*, 282 F. Supp. 3d at 1301. In this case, each element rests on generalized proof. Every class member will have conferred the same direct benefit on American in the same way: having money transferred from their pocket and into American's via their purchase of trip insurance on American's website. *Id.* Further, whether American voluntarily accepted and retained this benefit is subject to generalized proof because it is undisputed that American received an "Advertising Fee" (or commission) each time a class member purchased a trip insurance policy on American's website pursuant to the same Marketing Agreement between American and Allianz.

18

Whether it would be inequitable for American to retain the benefit without paying for it is subject to two alternative forms of generalized proof. First, this may be met by showing that American obtained the commissions through *objectively* deceptive means. *Id.* The same analysis applicable to the FDUTPA claim controls here. Alternatively, this element may be met if American "accepts and retains benefits that it is not legally entitled to receive in the first place" when it receives commissions for trip insurance sold on its website. *State Farm Fire & Cas. Co. v. Silver Star Health & Rehab*, 739 F.3d 579, 584 (11th Cir. 2013). This, too, is subject to generalized proof because whether American is legally entitled to accept and retain insurance commissions does not depend on any individualized inquiry. Indeed, courts in this district have certified unjust-enrichment classes in similar circumstances of uniform conduct by a defendant and unlawful kickbacks.[11] American's only argument is that this theory substantively lacks merit. But the theory rises or falls on a class basis without any individualized issues. Whether it has merit may be decided at summary judgment, but that analysis is irrelevant here, where it is already clear that its success or failure will apply on a class-wide basis and not involve individualized determinations.

### c. *Federal RICO*

The Undersigned will analyze each of Plaintiff's three theories of liability under RICO. First, Plaintiff's *third*-party reliance RICO theory is subject to generalized proof. The Supreme Court has already held that a plaintiff need not rely on a defendant's acts of mail or wire fraud to prevail on a RICO claim, and causation may be shown by damages resulting from a third-party's reliance on a fraudulent statement or omission. *Bridge*, 553 U.S. at 648–49. Here, Plaintiff's theory is that by defrauding third-party state regulators, American and the enterprise were able to keep

---

[11] *In re Checking*, 286 F.R.D. at 657–59; *Williams v. Wells Fargo Bank, N.A.*, 280 F.R.D. 665, 674–75 (S.D. Fla. 2012); *Cnty. of Monroe v. Priceline.com*, 265 F.R.D. 659, 671 (S.D. Fla. 2010).

their scheme going undetected. It was necessary to hide from regulators the fact that American receives commissions for sales of trip insurance and effectively is a broker without a license. Whether the enterprise made materially false statements to state regulators and whether state regulators relied on those false statements is an issue that is general to the class. One class member proving those elements proves it for all. Under a third-party reliance theory, a class member's reliance on any representation is not part of the proof for any element of this claim.[12]

Plaintiff's separate first-party reliance theory is also subject to class-wide proof. While a first-party reliance theory can sometimes preclude class certification, "[u]nder well-established Eleventh Circuit precedent, the simple fact that reliance is an element in a cause of action is not an absolute bar to class certification." *Klay*, 382 F.3d at 1258. Here, Plaintiff can establish first-party reliance on a class-wide basis because it may be inferred from uniform circumstantial evidence applicable to all class members. In *Klay*, the Eleventh Circuit expressly recognized that reliance for purposes of RICO may be proven through circumstantial and *common* evidence such that class certification would be appropriate. *Id.* at 1259 ("[B] based on the nature of the misrepresentations at issue, *the circumstantial evidence that can be used to show reliance is common to the whole class.* . . . Consequently, while each plaintiff must prove reliance, *he or she may do so through common evidence* (that is, through legitimate inferences based on the nature of the alleged misrepresentations at issue)."); *see also Davis v. S. Bell Tel. & Tel. Co.*, No. 89-cv-2839, 1993 WL 593999, at *11 (S.D. Fla. Dec. 23, 1993) ("[R]eliance is presumed where the misrepresentation at issue arises from material omissions." (citing *Shores v. Sklar*, 647 F.2d 462 (5th Cir. 1981)). As *Klay* makes clear, the key factor as to whether first-party reliance may be proven by common

---

[12] Furthermore, while Plaintiff seeks a *nationwide* class, he need not prove that regulators in *every* state were defrauded. It is sufficient that the regulators in Florida alone (or any one state) were defrauded. If the whistle were blown by a single regulator, the entire program would fall apart.

evidence is that the defendant made uniform representations to each class member. 382 F.3d at 1258. This case involves the same website and booking path as to each class member. It is exactly the type of case where first-party reliance is subject to common circumstantial evidence.

Moreover, American's uniform practice of setting out the cost of travel insurance as a separate line-item bill, where American never disclosed to consumers its receipt of a portion of that premium, makes this case analogous to *In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108 (2d Cir. 2013). There the Second Circuit affirmed certification of a RICO class predicated upon a similar false billing theory, noting "the thrust of the RICO claim is USF's scheme to create and employ the VASPs to inflate the invoices so as to overbill each class member in the exact same manner." *Id.* at 119. The same allegation exists here and is subject to common proof. Plaintiff alleges American's failure to disclose its receipt of commissions resulted in class members paying inflated invoices, as they paid more for their insurance policies to cover the alleged commissions.[13]

Finally, whether American and the enterprise engaged in money laundering to conceal the true nature of American's illegal commissions will be proved by the same facts as to each class member's claim. Plaintiff's theory is that American knows that its receipt of commissions for sales of insurance policies is illegal because it does not have a license to broker insurance, that American knows that its "marketing fees" are really commissions, and American has knowingly tried to disguise the commissions as "marketing fees." No individualized proof is necessary. American acted the same as to each class member and the answer to whether American's and its alleged co-conspirators' actions constitute money-laundering is the same as to each class member's claim.

---

[13] Regardless of individual reliance, premiums may have been inflated by including up to 50% commissions, and this theory is also subject to class-wide proof. And while Plaintiff need not prove the merits at this stage, the Undersigned notes that *American's* own expert confirmed that premiums increase as commissions increase. [ECF No. 417 at 57:7–16; 163:9–22.]

Once again, while American argues that the substantive merits of the money-laundering claim do not hold up, it does not point to any individualized issue to make that finding.[14]

### d. *Florida RICO*

Plaintiff's claim under Florida's Civil Remedies for Criminal Practices Act is likewise amenable to generalized proof. Whether American violated, conspired to violate, and aided and abetted others in the violation section 624.401, Florida statutes by knowingly selling and profiting from trip insurance without a license does not require any individualized inquiry. All the proof is based on what American did. The same goes for American's violation of section 896.101, Florida statutes. Every transaction was treated the same way and every illegal commission was allegedly illegally disguised as a "marketing" or "advertising" fee. Again, while American takes issue with the underlying merits, it presents no individualized issues that would defeat predominance.

Judge Nesbitt's decision certifying a Florida RICO class in *Davis* is instructive. While the defendant—like American—argued that reliance and damages had to be proven individually, the court rejected that argument because, as Plaintiff correctly maintains, "reliance is presumed where the misrepresentation at issue arises from material omissions." 1993 WL 593999, at *11. The court further held that any individualized inquiry regarding "simple matter[s]" of reliance and damages did not predominate the many common issues that would "require more extensive proof," such as whether the defendant engaged in a pattern of criminal activity, whether it had criminal intent, and whether it used the proceeds in operating a RICO enterprise. *Id.* at *12. In short, like in *Davis*, common questions predominate because "[a]ll of the issues concerning [defendant's] conduct are common the class." *Id.* Thus, common issues of fact and law predominate for all of the claims.

---

[14] Whether American participated in a racketeering enterprise is a common question capable of classwide resolution. *Bowe v. Pub. Storage*, 318 F.R.D. 160, 170 (S.D. Fla. 2015).

## 2.  Superiority

The superiority requirement is determined based on the following factors: (a) the class members' interests in individually controlling the prosecution of separate actions; (b) the extent and nature of any litigation concerning the controversy already begun by or against class members; (c) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (d) the likely difficulties in managing a class action. *Williams v. Mohawk Indus., Inc.*, 568 F.3d 1350, 1358 (11th Cir. 2009). Here, the likelihood that individual class members will prosecute separate actions is small due to the time and expense necessary to conduct such litigation relative to the small value of individual claims. *Carriulo*, 823 F.3d at 989 (superiority requirement met where "individual claims may be too small for a separate action by each class member"). The Undersigned is not aware of any litigation concerning the controversy already begun by or against class members. And this forum is a logical choice for this proceeding. Plaintiff resides in Florida and three counts are based on Florida law and limited to Florida purchasers. As to the nationwide RICO counts, there is no reason any other forum would be more desirable. Also, the fact that common issues predominate, as discussed *supra*, militates in favor of superiority. *Id.*; *Bowe v. Pub. Storage*, 318 F.R.D. at 184–85. Finally, no manageability concerns exist.

## E.  Rule 23(a)'s Requirements[15]

## 1.  Numerosity

American has not challenged numerosity and both classes easily satisfy it. "[M]ore than forty" members is generally adequate. *Cox v. Am. Cast Iron Pipe Co.*, 784 F.2d 1546, 1553 (11th Cir. 1986). Here, the amounts in alleged commissions that American has received make clear that

---

[15] Commonality is not separately discussed because the finding of predominance "necessarily satisf[ies] the commonality requirement." *Carriuolo*, 823 F.3d at 985.

both classes contain hundreds of thousands of members. [ECF No. 400 ¶¶ 43–49.] American's statement that there have been over 1,400 variations of the offer box shown to consumers also demonstrates numerosity. Finally, one example of the offer boxes states that more than 90,000 trip-insurance policies were sold in a *one-week* period alone. [ECF No. 352-3 at 6.]

### 2.  Typicality

Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." "[T]ypicality measures whether a sufficient nexus exists between the claims of the named representatives and those of the class at large." *Busby v. JRHBW Realty, Inc.*, 513 F.3d 1314, 1322 (11th Cir. 2008). A party seeking class certification satisfies the typicality requirement when it "possess[es] the same interest and suffer[s] the same injury as the class members." *Id.* "Class members' claims need not be identical to satisfy the typicality requirement; rather, there need only exist 'a sufficient nexus . . . between the legal claims of the named class representatives and those of individual class members to warrant class certification.'" *Ault v. Walt Disney World Co.*, 692 F.3d 1212, 1216 (11th Cir. 2012) (alteration in original). "This nexus exists 'if the claims or defenses of the class and the class representative arises from the same event or pattern or practice and are based on the same legal theory.'" *Id.*

Generally, if the plaintiff can show the "same unlawful conduct was directed at or affected both the class representatives and the class itself, then the typicality requirement is usually met irrespective of varying fact patterns which underlie the individual claims." *Agan v. Katzman & Korr, P.A.*, 222 F.R.D. 692, 698 (S.D. Fla. 2004). Plaintiff's claims are typical of all class members' claims because American's conduct as to Plaintiff was the same as to each class member. Furthermore, Plaintiff was allegedly damaged in the same way as each class member: through his payment of money that American deceptively presented as a pass-through charge to

Allianz. Finally, the Undersigned rejects American's argument that Plaintiff is subject to unique defenses that defeat a typicality finding.[16] *Cheney v. Cyberguard Corp.*, 213 F.R.D. 484, 493–94 (S.D. Fla. 2003) ("[T]ypicality is not defeated by specific defenses or counterclaims to the named plaintiff's claim. This is especially the case where the lead plaintiff alleges that he and the proposed class members were subject to a pattern of fraudulent conduct and suffered damages arising out of the same violations of federal and common law.").

### 3.  Adequacy

The Undersigned find that Plaintiff and his counsel will fairly and adequately protect and represent the interest of each class member. The adequacy of the representative plaintiff and class counsel involves "two separate inquiries: (1) whether any substantial conflicts of interest exist between the representatives and the class; and (2) whether the representatives will adequately prosecute the action." *Valley Drug Co. v. Geneva Pharm., Inc.*, 350 F.3d 1181, 1189 (11th Cir. 2003). No conflict of interest exists between Plaintiff and other class members. As he suffered the same alleged wrongs, Plaintiff's claims are the same as all class members. Plaintiff has also

---

[16] Even if Plaintiff was subject to unique defenses, it would not pose a typicality problem. "[W]hen there is a strong similarity of legal theories," the "typicality requirement may be satisfied despite substantial factual differences." *Williams*, 568 F.3d at 1357. Plaintiff's and the classes' legal theories are not just strongly similar; they are identical. And courts routinely reject the argument pressed by American. *See Dupler v. Costco Wholesale Corp.*, 249 F.R.D. 29, 39 (E.D.N.Y. 2008); *In re Checking*, 307 F.R.D. at 651 (S.D. Fla. 2015); *In re Scotts EZ Seed Litig.*, 304 F.R.D. 397, 405 (S.D.N.Y. 2015). Also, American has not shown that Plaintiff is subject to a voluntary-payment defense. First, it has not shown that Plaintiff had full knowledge of the relevant facts when he purchased trip insurance. *Brink v. Raymond James & Assocs.*, 341 F. Supp. 3d 1314, 1319 (S.D. Fla. 2018); *Cox v. Porsche Fin. Servs., Inc.*, 330 F.R.D. 322, 335 (S.D. Fla. 2019). Second, American's argument regarding Plaintiff's purchases of trip insurance *after* he filed this lawsuit raises an irrelevant issue because such payments would not vitiate Plaintiff's claim, which is based on his purchase *before* he filed this lawsuit. *See, e.g.*, *Knowles v. McDonald's USA, LLC*, No. 16-cv-81657, 2018 WL 8244277, at *7 (S.D. Fla. Feb. 9, 2018) (although "Plaintiff might have great difficulty" proving claim based on "subsequent times Plaintiff purchased the Happy Meal knowing of the existence of the alleged 'bait and switch' practice," that did not affect claim based on initial purchase); *cf. Carriuolo*, 823 F.3d at 987 ("injury occurs at point of sale").

aggressively pursued this litigation on behalf of the classes, and retained León Cosgrove, LLP, which has extensive class-action experience related to RICO and deceptive trade practices. In a similar consumer class action, the presiding judge described counsel's efforts and skill in litigating the case as "extraordinary." *Morgan v. Pub. Storage*, 301 F. Supp. 3d 1237, 1253 (S.D. Fla. 2016).

American's argument that Plaintiff was somehow improperly "solicited" is factually wrong and legally irrelevant. Plaintiff was not solicited. He is a former colleague of a former León Cosgrove partner who sent him an email through LinkedIn asking if he had ever purchased travel insurance. There was no improper "solicitation" here, and regardless, that would not be a reason to find Plaintiff inadequate. *Busby*, 513 F.3d at 1324. American fares no better with its claim that Plaintiff lacks knowledge of the case. A class representative is not required to become a legal expert or independently investigate his claims. "[R]elying on counsel to prosecute an action does not make a lead plaintiff inadequate." *City of Sunrise Gen. Emps.' Ret. Plan v. FleetCor Techs., Inc.*, No. 17-cv-02207, 2019 WL 3449671, at *6 (N.D. Ga. July 17, 2019). Further, Plaintiff's deposition testimony demonstrates that he frequently speaks with counsel about the case, understands his claims, reviews filings and keeps a case file, knows his class-representative obligations, attended mediation, produced discovery and sat for deposition, and is ready and willing to testify at trial. This final requirement is also met.

### F.  American's Waiver Argument.

American claims that Plaintiff agreed to the "site usage policy" of its website, which contains an agreement not to bring "any class action lawsuit related to your access to, dealings with, or use of the Site" against American. [ECF No. 117-1 ¶ 3]. The Undersigned disagrees.[17]

---

[17] This issue was more extensively briefed by the parties with respect to American's motion to transfer venue or strike class allegations. [ECF Nos. 117; 126; 132.] That motion is no longer pending. It was denied as moot when the parties filed a notice of settlement, and was never refiled.

Plaintiff is a member of American's AAdvantage Program and he bought his flight ticket using AAdvantage miles. If a customer is purchasing a ticket on American's website, the only way to use miles is to log in to the customer's AAdvantage account. [*Id.* ¶ 2.] When Plaintiff logged in, he was presented with a statement immediately above the log-in button stating: "By logging in, I accept the AAdvantage terms and conditions and privacy policy." [*Id.*] The phrases "terms and conditions" and "privacy policy" were hyperlinks to *those* documents. Importantly, the privacy policy and AAdvantage terms and conditions did *not* contain the above-quoted class-action waiver.

Instead, clicking the "terms and conditions" hyperlink will open a new window with the AAdvantage terms and conditions. In this new window, on the sixth page of the eight-page AAdvantage terms and conditions, within a list of multiple bullet-point paragraphs under the heading "Redeeming AAdvantage miles," one of the many bullet-point paragraphs states:

> American Airlines assumes no responsibility for and is not liable for any unauthorized access by third parties to a member's account and/or account information, including but not limited to any unauthorized award transaction made from the account, except as provided under applicable laws. American assumes no obligation or duty to re-credit any unauthorized mileage withdrawal made by third parties; however, American reserves the right to review, in its sole discretion, requests for re-crediting unauthorized mileage withdrawals provided such request is made to American within three months of the unauthorized withdrawal. By accessing your AAdvantage account on aa.com, you agree to the aa.com site usage policy.

[ECF No. 117-1 at 9.] A hyperlink under this paragraph states: "View the aa.com site usage policy." [*Id.*] Clicking *that* link opens a *second* new window with the site usage policy. On the sixth page of the site usage policy, there is the class-action waiver. The Undersigned disagrees that, by clicking a button above which was the statement "By logging in, I accept the *AAdvantage terms and conditions and privacy policy*," Plaintiff *also* agreed to a third unlisted site usage policy.

Courts distinguish "clickwrap" and "browsewrap" agreements. As its name suggests clickwrap is when a website requires a user to click a button or check a box to acknowledge

agreement to a list of terms and conditions presented to the user. *Vitacost.com, Inc. v. McCants*, 210 So. 3d 761, 762 (Fla. Dist. Ct. App. 2017). Clickwrap is generally enforceable. On the other hand, browsewrap is when a website merely provides a link to certain terms and conditions, but does not require the user to click any acknowledgment of them. *Id.* The user can continue using the website or make a purchase without being directed to the terms and conditions. Browsewrap agreements are enforceable only "when the purchaser has actual knowledge of the terms and conditions, or when the hyperlink to the terms and conditions is conspicuous enough to put a reasonably prudent person on inquiry notice." *Id.* "Uniformly, courts have declined to enforce 'browsewrap' agreements when the hyperlink to the terms and conditions is buried at the bottom of the page, and the website never directs the user to review them." *Id.* at 765.[18]

A third type of hybrid agreement, sometimes called "click through," is similar to pure clickwrap in that it requires a user to click a button to acknowledge agreement to terms and conditions. But different from clickwrap is that the terms and conditions are only referred to on the screen with the button, and the user must take the extra step of clicking a hyperlink to read them. In *Fteja v. Facebook, Inc.*, the court analyzed such "hybrids." 841 F. Supp. 2d 829 (S.D.N.Y. 2012). The *Fteja* court enforced a forum-selection clause in a website's terms of service where a notice below the "Sign Up" button stated, "By clicking Sign Up, you are indicating that you have read and agree to the Terms of Service," and the user had clicked "Sign Up." *Id.* at 838–40.

---

[18] American has not shown that the site usage policy could be enforceable as browsewrap. Plaintiff did not have actual notice of it, [ECF No. 126-1], and the link to it was inconspicuous and required scrolling through multiple pages to find it. *Vitacost*, 210 So. 3d at 763 (terms and conditions unenforceable where "purchaser would have to scroll through multiple pages of products before reaching the bottom where the link is located"); *Hines v. Overstock.com, Inc.*, 668 F. Supp. 2d 362, 367 (E.D.N.Y. 2009) (terms and conditions unenforceable where user had to scroll to bottom of webpage to see hyperlink); *In re Zappos.com*, 893 F. Supp. 2d 1058, 1064 (D. Nev. 2012) (terms and conditions unenforceable where hyperlink was buried near bottom of webpage).

Relevant here, the court distinguished case law where "[t]he terms and conditions were not visible anywhere on the screen containing the . . . button." *Id.* at 835. It explained that such case law was not controlling because the "Sign–Up page's reference to the Terms of Use *appeared immediately below* the 'Sign–Up' button." *Id.* (emphasis added). The court noted that the agreement was similar to browsewrap because "the terms and conditions were not displayed on the page where the user purportedly assented to the terms. Instead, those terms were visible only by clicking on a hyperlink." *Id.* But the appearance of a hyperlink to those terms on the same page as the "Sign Up" button, combined with the statement on that same page that clicking was an acceptance of the hyperlinked agreement, was enough to render the agreement enforceable. *Id.* at 839–41.

Like in *Fteja*, in every "click through" case the hyperlink to the terms and conditions that the user is assenting to via her click is on the *same screen* as the button she must click, is conspicuous *on that screen*, and appears alongside a notice that clicking the button is an acceptance to the *specifically-referenced and hyperlinked* terms and conditions.[19] The absence of those facts distinguishes this case from a "hybrid clickwrap" case. Here, Plaintiff was told that, by clicking a log-in button, he was assenting to the *AAdvantage terms and conditions* and a *privacy policy*. Hyperlinks were provided for *those two* agreements. Nowhere on the log-in screen was Plaintiff informed of the existence of a *third* agreement. To learn that, he would have to click the terms and conditions hyperlink, from that new window scroll down six pages to find a buried reference to

---

[19] *E.g.*, *Crawford v. Beachbody, LLC*, No. 14-cv-1583, 2014 WL 6606563, at *3 (S.D. Cal. Nov. 5, 2014) (forum-selection clause binding where user clicked button marked "Place Order" and above button was statement informing him that clicking the button subjected user to website's terms and conditions, which were available in same screen via hyperlink); *Swift v. Zynga Game Network, Inc.,* 805 F. Supp. 2d 904, 908, 912 (N.D. Cal. 2011) ("Because Plaintiff was provided with an opportunity to review the terms of service in the form of a *hyperlink immediately under the 'I accept' button* and she admittedly clicked 'Accept,' the cases cited by Zynga are more relevant and persuasive that a binding contract was created here." (emphasis added)).

the "site usage policy," and then yet again click that hyperlink to open a new window. Then Plaintiff would have to scroll down another six pages to finally find the class-action waiver.

These facts contain aspects of both browsewrap and a "click through" agreement. The similarity to a "click through" agreement is that Plaintiff did click something and was told that the click manifested an acceptance of certain terms and conditions. But that is where the similarities end. The terms and conditions that Plaintiff accepted by his click did *not* include the class-action waiver. Instead, the class-action waiver was part of a separate site usage policy, the site usage policy was not hyperlinked or even referenced (let alone conspicuously so) on the log-in screen, the only reference and hyperlink to the site usage policy could be found only after scrolling through multiple pages in a separate "terms and conditions" window, and the reference to the site usage policy is not even conspicuous within that "terms and conditions" window (located six pages in at the end of one paragraph in a list of bulleted paragraphs under a "Redeeming AAdvantage miles" heading). Those facts make the site usage policy more like browsewrap. *See IT Strategies Grp. v. Allday Consulting Grp., L.L.C.*, 975 F. Supp. 2d 1267, 1283 (S.D. Fla. 2013) (terms and conditions unenforceable where "warning *contained no hyperlink to the online user agreement*, and *did not otherwise alert the user to the existence* or location of any confidentiality or security requirements other than those set forth in the security warning" (emphasis added)). While the site usage policy has aspects of both browsewrap and a "click through" agreement, it is much more like browsewrap.

The Undersigned finds American's characterization of the site usage policy as a typical clickwrap agreement specious. What makes clickwrap enforceable is the *notice* provided to the user that the click manifests assent to a *disclosed* agreement, with the terms of *that agreement* readily-available either included on the same screen or via a hyperlink on the same screen.

*Conspicuousness* is the touchstone of enforceability.[20] As American states: "When a party is '*informed of the consequences of his assenting click* and [is] *shown, immediately below*, where to click to understand those consequences,' the terms are binding." [ECF No. 352 at 14] (alteration in original) (emphasis added) (quoting *Fteja*, 841 F. Supp. 2d at 839–40).

Here, Plaintiff was not informed that a consequence of his click was agreement to the site usage policy, which was not referenced at all on the log-in screen. Instead, the hyperlinked agreement within a hyperlinked agreement is directly contrary to what American told Plaintiff the consequences of his click would be. American told Plaintiff that the consequences of clicking the log-in button was "accept[ing] the AAdvantage terms and conditions and privacy policy." But now American claims Plaintiff actually was also assenting to a third agreement. If that were the case, a reference and hyperlink to the site usage policy should have been made available to Plaintiff above the log-in button—as was the case with the AAdvantage terms and conditions and privacy policy. *IT Strategies*, 975 F. Supp. 2d at 1280 ("[A] consumer's clicking on a download button does not communicate assent to contractual terms *if the offer did not make clear to the consumer* that clicking on the download button would signify assent to *those* terms." (emphasis added) (quoting *Specht v. Netscape Commc'ns Corp.*, 306 F.3d 17, 29–30 (2nd Cir. 2002))); *Fteja*, 841 F. Supp. 2d at 835 (explaining that, in *Specht*, the terms and conditions were not enforceable because they "were not visible anywhere on the screen containing the download button" and only reference to them would become visible if plaintiffs scrolled down to next screen").

---

[20] *See Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 78–79 (2d Cir. 2017) (fact that terms of service were available only by hyperlink does not preclude enforceability "[a]s long as the hyperlinked text was itself reasonably conspicuous"); *Nicosia v. Amzaon.com, Inc.*, 834 F.3d 220, 233 (2d Cir. 2016) ("Whether there was notice of the existence of additional contract terms presented on a webpage depends heavily on whether the design and content of that webpage rendered the existence of terms reasonably conspicuous."); *id.* at 237 & n.5; *Fteja*, 841 F. Supp. 2d at 835 ("threshold requirement" is whether "clause was reasonably communicated" to user).

Taking its argument to its logical conclusion, American could have embedded another hyperlink to another agreement in the site usage policy, and that also would be enforceable. And so on. The Undersigned rejects American's "Russian doll" approach to contract formation where a hyperlinked agreement contains a hyperlink to another agreement, which theoretically could then contain a hyperlink to another agreement. If adopted, that would incentivize businesses to bury the most objectionable terms in layers of hyperlinked agreements. It is not too much to ask of website users to click a conspicuous hyperlink, located on the same page as the click button, to the same document they are told they are agreeing to. But it is unreasonable to expect them to search for additional hyperlinks to new documents, and possibly further hyperlinks within those—especially when the log-in screen says that logging in is acceptance of only two expressly listed documents. American fails to cite any case supporting a hyperlink-within-a-hyperlink approach, and instead relies solely on traditional clickwrap and "click through" cases. The Undersigned thus finds that Plaintiff did not agree to the site usage policy and did not waive his right to bring this class action.[21]

## III.   Conclusion

The Undersigned **recommends** that the District Court **grant** Plaintiff's motion for class certification by certifying both proposed classes, appointing Plaintiff as class representative, and appointing León Cosgrove, LLP as class counsel.

**RESPECTFULLY RECOMMENDED** in Chambers, in Miami, Florida, on _____, 2019.

_____
HONORABLE JONATHAN GOODMAN
United States Magistrate Judge

---

[21] American also waived reliance on the class-action waiver by not raising it until over a year into this litigation while actively litigating this case, seeking rulings on the merits, and engaging in class-related discovery. The parties also filed a notice of a *class* settlement. American has acted inconsistently with a purported class-action waiver. The facts here are analogous to when a party waives its right to arbitration by actively litigating a case. *Fla. Ins. Guar. Ass'n v. Branco*, 148 So. 3d 488, 493 (Fla. Dist. Ct. App. 2014). Even if Plaintiff were bound by the site usage policy (the Undersigned finds he is not), American would be unable to enforce it under the facts of this case.